168 S.W.3d 875 (2005)
In the Interest of S.E.W. and S.A.W., Children.
No. 05-03-01175-CV.
Court of Appeals of Texas, Dallas.
May 19, 2005.
Rehearing Overruled August 19, 2005.
*878 Kellye A. Swanda, Arlington, April E. Smith, Mesquite, for appellant.
Lori L. Ordiway, Asst. Dist. Atty. for Dallas County, Chief of the Appellate Division, Dallas, for appellee.
Before Justices MOSELEY, BRIDGES, and O'NEILL.

OPINION
Opinion by Justice MOSELEY.
In this termination of parental rights case, the primary issues are whether an expert witness was qualified to give an opinion as to the results of drug testing of hair samples and whether the opinion was reliable where the expert did not conduct the test or know which of several available tests the laboratory used. Although we conclude the evidence is legally sufficient to support the judgment, we conclude the trial court abused its discretion in admitting the expert's opinion and the error probably caused the rendition of an improper judgment. We reverse the trial court's judgment and remand for further proceedings.
After two referrals and an investigation, the Texas Department of Protective and Regulatory Services removed S.E.W. and S.A.W. from Debbie Marien (Mother) and Stefan Geller (Father) and later sought to terminate their parental rights to the children. Based on the jury's findings that the parents endangered the physical or emotional well-being of the children and that termination was in the children's best interest, the trial court terminated the parental rights of Mother and Father to their son, S.E.W., and daughter, S.A.W.

BACKGROUND
Mother was married to another man in California when S.E.W. was born. In 2001, Mother, who was pregnant, Father, and S.E.W. were traveling from California to Kentucky to stay with her relatives. On the way, they stopped in Dallas due to Mother's illness. S.A.W. was born in Dallas on October 28, 2001. The family obtained assistance from a local church, including a baby bed, food, clothing, and other basic items because they did not have anything to care for the new baby. The associate pastor of the church, Steve Hardin, called the Department three days after S.A.W.'s birth because of his concerns about the family's living conditions  they were staying in a motel in an area known for a high crime rate. The Department investigated and ruled out any abuse or neglect, but told the pastor it would keep the case open.
*879 Later, the family was able to move to a better motel. Hardin continued to provide food and milk, but would not give them cash because Father would spend it on alcohol. Hardin also tried to help Father find work, but Father did not have proper identification. The family spent Thanksgiving with Hardin and his family. Hardin was concerned that Mother appeared glassy-eyed and was unable to care for her children, and might be under the influence of drugs. Hardin's family took care of the baby while Father was preoccupied with S.E.W., who was 20 months old. Father's interaction with S.E.W. was tender and appropriate. (There is evidence in the record that Father did not know either child was his until paternity testing was done in this case.)
After Thanksgiving, the family moved again. The clerk of the motel where they were living called Hardin several times about the oldest child being left alone. Hardin confronted Mother about the complaints and she said S.E.W. had been unsupervised but that she was too tired to get up. The family continued to move to different motels.
The manager and clerk of one of the motels testified that several times they saw the oldest child wander out of the room to the office. They would return him to the room. One time, the door to the room was open and Mother was asleep. The clerk testified she did not know about the baby. Father allowed the older child to wander away from the laundry room several times. Each time the child was returned to him, he would become angry and spank the child. The manager said Father handled the child roughly, dragging him by the arm. Other residents complained about Mother and Father begging for money or food, screaming at each other, and using alcohol. Motel employees gave the family money for a while, but stopped after they began to doubt Mother was using the money to buy milk and diapers.
Alma Bradshaw, a resident of the motel, tried to help the family. She first saw Mother standing outside the motel in the rain with the baby. Bradshaw invited Mother in for coffee. When Father came home from work he was drinking whiskey. Bradshaw testified that when the oldest child walked in front of the television, Father told him to move then threw him against the wall. The child then ran to Bradshaw for comfort. Mother, who was drinking tequila in her coffee, did not say anything to Father during the incident. Bradshaw also described an incident where she saw the older child run into the parking lot and Mother dragged him across the pavement by the arm and the leg.
Bradshaw admitted that she had been convicted of sexually abusing a two-year old child almost ten years before trial, that she had been taking psychotropic medications for about twenty years, she had been in numerous mental institutions, and she had mutilated herself and had suicidal thoughts. Her mental health records were admitted in evidence.
Bradshaw testified that both children developed bad rashes because Mother used motel hand towels for diapers and did not change them when wet. Many times, the children were given sugar water instead of milk. Bradshaw also said that Mother often left the children unsupervised while she walked to the store or begged for money. Bradshaw gave the family money to buy milk, but they spent it on cigarettes and alcohol.
Bradshaw contacted the Department in March 2002. During Department interviews, both Mother and Father admitted to using drugs as teenagers, but denied currently using drugs. The Department determined drug testing was necessary to *880 assess the risks to the children. Mother and Father agreed to drug testing, but the collection company was only able to obtain a hair sample from Mother. The Department removed the children after receiving the results of Mother's test.
After the children were removed, Bradshaw arranged for Mother and Father to move in with Bradshaw's former foster mother. During this time, Bradshaw saw Father strike Mother. At a later time, police were called about a disturbance between Mother and Father. According to the police officer, Mother said Father threatened to shoot her with a rifle. Mother was hysterical but stated that Father threatened to kill her with the gun. The officer found Father standing by his truck several yards away from the house. Father was initially calm, but became agitated and began shouting profanities at and about Mother. The officer was afraid Father would harm Mother if left alone with her. Father was arrested but later released after Mother signed an affidavit of non-prosecution. Mother told the officer she had been drinking and the officer smelled alcohol on Father.
The Department filed a petition to terminate Mother's parental rights about three months after removing the children. At that time, the identity of the father of the children was uncertain. After paternity testing determined that Father was the biological father of both children, the Department filed an amended petition to terminate his parental rights to the children.
After the petition was filed against Father, he had an altercation with Bradshaw. Father slashed Bradshaw's throat with a knife and told her, "This is for you taking my kids away." Father was awaiting trial on criminal charges relating to this incident at the time of the trial of the termination case.
Mother denied that Father ever threw the older child against the wall, denied ever using hand towels instead of diapers, and denied giving the children sugar water instead of milk. She also denied that Father abused her or that she ever told anyone he was abusive. She said she called the police because she thought Father was going to shoot himself and the police arrested him even though she told them Father had not threatened her. Regarding her positive drug test, Mother claimed that she had been given a cigarette with cocaine in it by another woman. Mother became sick after smoking the cigarette. According to Mother, the woman who witnessed this was murdered several days later. Mother believed Bradshaw had "set her up."
After the children were removed, Mother and Father submitted to five random urine analyses. All were negative. A Department representative said this indicated there was no ongoing drug problem. Mother submitted another hair analysis in October 2002. Father submitted a hair analysis in February 2003. According to an expert from the company that collected the hair samples, both hair samples tested positive for cocaine.

LEGAL SUFFICIENCY
In his second and fourth issues, Father challenges the legal sufficiency of the evidence to support the judgment. Mother does not challenge the legal sufficiency of the evidence to support the judgment against her. Father attacks the sufficiency of the evidence to support the finding that termination was in the best interest of the children, but his only argument is that because the evidence is insufficient to support the statutory grounds for termination, termination cannot be in the best interest of the children. Therefore, we only address the sufficiency of the evidence to *881 support the statutory grounds for termination.
Involuntary termination of parental rights implicates fundamental constitutional rights. See Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In re G.M., 596 S.W.2d 846, 846 (Tex.1980). A trial court may order involuntary termination of parental rights if the factfinder finds by clear and convincing evidence (1) the parent has committed one of the enumerated statutory conditions, and (2) termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). Each required finding must be based on clear and convincing evidence. Id. § 161.206(a). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. § 101.007. This level of certainty is necessary to preserve the fundamental fairness in government-initiated proceedings that threaten to end a natural parent's desire for and right to companionship, care, custody, and management of his or her children. See Santosky v. Kramer, 455 U.S. 745, 756-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." Id. (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).
When we review the legal sufficiency of the evidence in a parental-rights termination case, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the Department bears the burden of proof. In re J.F.C., 96 S.W.3d 256, 265-66 (Tex.2002); Wilson v. State, 116 S.W.3d 923, 928 (Tex.App.-Dallas 2003, no pet.). In a legal sufficiency review, we look at all the evidence in the light most favorable to the finding; we assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so; and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. J.F.C., 96 S.W.3d at 266. We do not, however, disregard undisputed evidence that does not support the finding. Id.
Here, the Department alleged grounds for termination under family code subsections 161.001(1)(D) (i.e. endangering conditions or surroundings) and 161.001(1)(E) (i.e. endangering conduct). See Tex. Fam.Code Ann. §§ 161.001(1)(D), (E). Subsection 161.001(1)(D) requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Id. § 161.001(1)(D). This subsection refers only to the acceptability of the child's living conditions. See In re S.H.A., 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Subsection 161.001(1)(E) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam.Code Ann. § 161.001(1)(E). This subsection refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. In re S.H.A., 728 S.W.2d at 85. The Department need only prove one of the subsections in order to satisfy the first requirement of section 161.001. Wilson, 116 S.W.3d at 928. We first address the evidence as to subsection 161.001(1)(E) (i.e. endangering conduct).
*882 The record contains evidence that Father would spend money on alcohol and cigarettes rather than on the needs of the children. There was also evidence Father neglected the older child by allowing him to wander off unsupervised. The record contains evidence of Father's violence and emotional abuse toward the children. Father yelled at and spanked the older child after allowing him to wander away. Father threw the child against the wall for walking in front of the television. There was also evidence of violence against Mother and Bradshaw. There was evidence of Father's abuse of alcohol, drug use as a teenager, and his positive hair test for cocaine. Although some facts were disputed, a reasonable factfinder could resolve those disputes in favor of the findings supporting termination. Based on this and other evidence in the record, viewed in the light most favorable to the findings, the jury could reasonably form a firm belief or conviction that Father "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." Tex. Fam.Code Ann. § 161.001(1)(E). We conclude the evidence is legally sufficient to support the jury's finding. Because this finding is sufficient to support the judgment terminating Father's parental rights to the children, we need not discuss the other statutory grounds. See Wilson, 116 S.W.3d at 928. We resolve Father's second and fourth issues against him.

EXPERT TESTIMONY
Before trial, the trial court held a hearing to determine the qualifications and admissibility of the Department's expert witness regarding drug testing. The trial court overruled the challenge and allowed the expert to testify at trial over Father's objection. Father's first issue and Mother's third issue assert the trial court erred in allowing the expert to testify.
For an expert's opinion to be admissible under evidence rule 702, the expert must be qualified on the specific issue before the court, and the expert's opinion must be relevant and based on a reliable foundation. Tex.R. Evid. 702; Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 628 (Tex.2002); Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 719-20 (Tex.1998); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex.1997); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556-58 (Tex.1995). We review the trial court's decision to admit or exclude expert testimony for abuse of discretion. See Gammill, 972 S.W.2d at 727; Robinson, 923 S.W.2d at 558.
At the pretrial hearing, the Department called James Turnage as an expert in drug testing. Turnage testified his company did drug and DNA testing. Turnage has the highest certification for administering and collecting specimens. Once collected, the specimens are sealed and shipped to an independent laboratory in Nevada. The laboratory actually performs the testing on the specimens and sends a report back to Turnage. He explained that federal transportation regulations require collection companies to send samples to be tested by an independent laboratory. His company has used a laboratory in Nevada for several years. The laboratory is certified and although Turnage had never visited the facility, he believed the laboratory was qualified and had excellent reliability.
Turnage's employees collected hair samples from Mother in October 2002 and from Father in February 2003. Turnage sent those samples to the laboratory in Nevada and received a report back from the laboratory. The reports were not admitted in evidence at trial or the pretrial hearing. According to Turnage, the reports *883 indicated the methodology used by the laboratory, but not the specific instrument or machine used. Turnage explained the methodology was to perform an immunoassay test initially. If that test indicated a positive result, either a gas chromatography mass spectrometry (GCMS) or gas chromatography mass spectrometry mass spectrometry (GCMSMS) test would be run to confirm the results. The reports in this case did not indicate whether the GCMS or the GCMSMS test was performed and Turnage did not know which test was actually performed. Based on the reports, however, Turnage gave the opinion that Mother and Father tested positive for cocaine. He explained that Mother's test indicated she had used cocaine within three months of the test because her specimen was head hair. Father's specimen was body hair and Turnage explained that a positive test result on body hair would indicate usage within a period of seven to ten months before the test.
Turnage testified similarly at trial. Turnage also admitted he had no knowledge about the test done on Mother's hair in March 2002, about seven months before his company collected a sample from Mother. He was shown a document and asked about the results of the March 2002 hair strand test collected by another company. He testified that the results were from the same laboratory that he used and based solely on the document shown him at trial he opined that Mother was positive for cocaine in March 2002.
In determining whether an expert is qualified, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." Gammill, 972 S.W.2d at 719 (quoting Broders v. Heise, 924 S.W.2d 148, 152 (Tex.1996)). Turnage admitted he had no knowledge of how the actual tests were performed on these samples, of the protocols used for the instruments or whether those protocols were followed with these samples, and whether or not a standard was run before or after the tests. He also admitted he was not an expert on the operation of the instruments for conducting a GCMS test.
The Department argues Turnage was only an expert in collecting samples, sending them to the laboratory, and interpreting the results. However, the actual results of the scientific tests are the relevant evidence of drug use in this case. Turnage was the sponsoring witness for the test results. By his own admission, Turnage was not qualified to give an opinion as to the results of the scientific tests on the hair samples his company collected. As the Department concedes, "He made no claims of expertise in the actual testing of the samples or the ultimate reliability of the tests or instruments used by the lab." Thus his interpretation of the results of the laboratory tests fails to establish that those results are reliable. Turnage's "opinion" that the samples tested positive for cocaine was beyond the scope of his expertise and based entirely on the written report he received from the laboratory in Nevada. Thus he did not have expertise concerning the actual subject about which he offered his expert opinion. Gammill, 972 S.W.2d at 719. Without a positive result, Turnage's opinions about hair sampling were irrelevant.
Rule 702 also requires that expert testimony be relevant and based on a reliable foundation. Tex.R. Evid. 702. In determining reliability, the trial court should evaluate the methods, analysis, and principles relied on by the expert in reaching the opinion and ensure that the opinion comports with applicable professional standards and has a reliable basis in the knowledge and experience of the discipline. *884 Gammill, 972 S.W.2d at 725-26. The supreme court has identified several non-exclusive factors to determine whether an expert's testimony is reliable and admissible. See Robinson, 923 S.W.2d at 557. These factors may not be apply to certain types of testimony, but there must be some basis for the opinion offered to show its reliability. Expert testimony is unreliable if "`there is simply too great an analytical gap between the data and the opinion proffered.'" Gammill, 972 S.W.2d at 726 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).
The Department did not offer evidence explaining the scientific theory and reliability of the immunoassay and GCMS/GCMSMS tests for determining whether a person had used cocaine. Nor did the Department request the trial court take judicial notice of the reliability of these scientific tests. See Tex.R. Evid. 201; Hernandez v. State, 116 S.W.3d 26, 29 (Tex.Crim.App.2003) (concluding that scientific validity and reliability of scientific theory and methodology may be established by judicial notice). Thus, the trial court was not presented with the information necessary for it to perform its gatekeeping function. See Hernandez, 116 S.W.3d at 30 (concluding trial court abused its discretion in admitting drug test results of an ADx analyzer "without any showing of its scientific reliability or any reliance upon other scientific materials or judicial opinions which had found `an ADx analyzer' a reliable methodology for determining whether a person does or does not have marijuana in his body.").
We do not suggest that the testing methods used by the remote laboratory are not reliable, only that this record does not establish the reliability of those methods either by evidence or through a proper request for judicial notice. We recognize that "Texas and Federal courts have found the gas chromatography test to be a reliable method for identifying compounds, and it has been generally accept[ed] in the scientific community." Combs v. State, 6 S.W.3d 319, 322 (Tex.App.-Houston [14th Dist.] 1999, no pet.). This record, however, does not reflect that the trial court took judicial notice of the reliability of such methods or was provided with the information necessary to take such notice.
Further, even though the scientific theory of testing hair samples for illegal drugs using immunoassay and GCMS or GCMSMS may be reliable, there was no showing of the reliable application of that theory in this case. Turnage merely speculated that the lab must have followed protocol or it would lose its license. He said that the report would not have been released if the results were not correct. The law does not require a "court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." Kerr-McGee Corp. v. Helton, 133 S.W.3d 245, 258 (Tex.2004) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Thus the results of the tests are not reliable simply because Turnage said they were. See Havner, 953 S.W.2d at 712 ("[I]t is not so simply because `an expert says it is so.'"). The court must independently evaluate the underlying data to ensure that the methodology is reliably applied in this specific case. Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 808 (Tex.2002); Havner, 953 S.W.2d at 712.
Turnage's expertise in collecting hair samples for testing could not bootstrap the reliability of the actual testing procedures done by the remote laboratory. He admitted he had no expertise in the actual testing or ultimate reliability of the tests or instrumentation used by the laboratory. Despite this admission, Turnage *885 rendered the opinion that Mother and Father's hair samples were positive for cocaine. We conclude the trial court abused its discretion in admitting Turnage's testimony.
We now consider whether the trial court's error was harmful. Tex.R.App. P. 44.1(a). We look to the whole record to determine whether the error probably caused the rendition of an improper judgment. Id.; City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex.1995); McCraw v. Maris, 828 S.W.2d 756, 758 (Tex.1992).
The evidence regarding drug use in this case was critical and was disputed. One Department supervisor testified that the decision to remove the children was based solely on Mother's positive hair test in March 2002. While both Mother and Father admitted to the Department they had used drugs as teenagers, they denied currently using drugs. Mother and Father also submitted to five random urinalyses, all of which were negative for drug use. A Department supervisor agreed these results indicated no ongoing drug problem. However, based on the positive results of the hair tests, the supervisor recommended termination of parental rights because of drug usage.
Much of the other evidence in the case was disputed. Mother denied giving the children sugar water instead of milk and testified she always used diapers, never hand towels. She also denied that Father threw S.E.W. against a wall. The initial referrals to the Department ruled out abuse or neglect. Mother explained that the Department's chief witness, Bradshaw, had set her up and arranged for her to borrow a cigarette laced with cocaine. Mother claimed this was the cause of the first positive drug test and that the second test overlapped the first test. Turnage denied that the two tests could have overlapped. Bradshaw, a witness to many of the neglect and abuse allegations, had significant credibility issues, including a prior conviction for sexually abusing a two year old child and mental health problems.
Based on a review of the entire record, we conclude that the error in admitting the expert testimony regarding the results of the drug tests probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a).

DISPOSITION
To preserve error for appeal, a party must make a timely and specific objection to the admission of the evidence. Tex.R.App. P. 33.1, Tex.R. Evid. 103(a)(1). The record is clear that the pretrial hearing was a hearing to determine a Daubert/Robinson challenge. Mother's attorney was present at the hearing, but did not question the expert and did not argue for or against the challenge. Mother did not file a written objection to the expert's testimony, nor did she object or ask any questions of the expert during the pretrial hearing. Mother did not object to the expert's testimony at trial on the grounds of reliability or lack of qualifications. She did, however, file a motion for new trial where she argued the expert was not qualified because he had no knowledge of the machines used to conduct the drug test, the methodology used in the drug testing, the last time the machine was cleaned, whether the protocol for the machine was followed, and he was only an expert as to collection of hair samples, not testing for drugs.
The Department argues that Mother failed to preserve error on her objections to the reliability of the expert testimony. We agree that Mother failed to preserve error on this issue. However, we have broad discretion to remand in the *886 interest of justice. Scott v. Liebman, 404 S.W.2d 288, 294 (Tex.1966). As long as there is a probability that a case for any reason has not been fully developed, an appellate court has the discretion to remand rather than render a decision. Kondos v. Lincoln Prop. Co., 110 S.W.3d 716, 724 (Tex.App.-Dallas 2003, no pet.); Bayway Serv., Inc. v. Ameri-Build Constr., L.C., 106 S.W.3d 156, 161 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Because we conclude the trial court erred in overruling Father's objection to the expert opinion and that error was harmful, a new trial will be necessary. We also conclude that a remand of the case against Mother is in the interest of justice. We resolve Father's first issue and Mother's third issue in their favor. Accordingly, we reverse the trial court's judgment and remand for further proceedings. We need not address the remaining issues. Tex.R.App. P. 47.1.
The judgment of the trial court is reversed and this case is remanded for further proceedings.