

# NUMBER 13-13-00543-CV
# COURT OF APPEALS
# THIRTEENTH DISTRICT OF TEXAS
# CORPUS CHRISTI – EDINBURG

## In the Interest of M. M., A Child

## On appeal from the 347th District Court of Nueces County, Texas.

## MEMORANDUM OPINION
### Before Justices Rodriguez, Garza, and Perkes
### Memorandum Opinion by Justice Perkes

Following a bench trial, the trial court terminated C.M.'s ("Mother") parental rights to her minor daughter, M.M.[1] By three issues in this accelerated appeal,[2] Mother argues the evidence is legally and factually insufficient to support the trial court's findings that

---

[1] In parental-rights-termination appeals, we use aliases to protect the minor's identity. *See* TEX. R. APP. P. 9.8(a). In this context, "an alias means one or more of a person's initials or a fictitious name, used to refer to the person." *See id.*

[2] Parental-termination appeals are accelerated appeals. *Id.* R. 28.4. Under Texas Rule of Judicial Administration 6.2(a), in an appeal like this one involving the termination of parental rights, this Court should "so far as reasonably possible, ensure that the appeal is brought to final disposition" within 180 days of the date the notice of appeal was filed. *See* TEX. R. JUD. ADMIN. 6.2.

Mother's notice of appeal was filed on September 10, 2013. Mother's counsel requested an extension of time to file her appellate brief in this Court. Mother filed her brief on December 30, 2013 and Father filed his brief on January 30, 2014. We are required to issue our opinion on or before March 8, 2014, leaving this court with thirty-eight days to review the appellate record, and to research, draft, circulate, and issue this opinion.

she engaged in conduct that warranted termination of her parental rights. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (P) (West, Westlaw through 2013 3d C.S.). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

M.M. was born to Mother and A.M. ("Father") on June 25, 2007.[3] In March 2011, Father and his wife, M.M.'S "Stepmother," filed a petition for termination of Mother's parental rights to M.M. and for the adoption of M.M.[4] In August 2013, the trial court held a bench trial on the termination petition. The evidence adduced at the termination trial is summarized as follows.

## A. Mother's Testimony and Conduct

### 1. Mother's Marital History

Mother was thirty-one years old at the time of the termination trial. Mother and Father were married for approximately six months and divorced in 2009. Mother was given primary custody of M.M. Mother testified that she had M.M. in her possession "[a]ll the time other than [Father's] weekends." Mother testified that Father regularly exercised his visitation with M.M.

After the divorce, Mother was "seeing" T.B. for approximately two-and-a-half months. T.B. was incarcerated at the time of the termination trial. Mother and T.B. had a son together who was born in March 2011. Mother voluntarily gave the son up for adoption at birth.

---

[3] The amended petition for termination of the parent-child relationship and for the adoption of a child alleged M.M.'s birthdate was May 25, 2007. However, the testimony at the termination trial showed M.M. was born on June 25, 2007.

[4] We note that the trial court's termination order identifies Stepmother, whose initials are also C.M., as a petitioner for adoption of M.M., but not a petitioner for termination of parental rights.

Mother testified that she lives with her husband of approximately one year, B.D.S. Mother testified that she and B.D.S. had a five-month-old infant together and that because the infant is nursing, Mother does not work. Mother plans to return to school after the infant is weaned. B.D.S. is Mother's source of financial support. Mother admitted that, within the last three years, she was a victim of an assault (family violence) that B.D.S. perpetrated against her, but that the charge against B.D.S. was dismissed because she failed to appear in court.

### 2. Mother's Illegal Drug Offenses and M.M.'s Removal from Mother

Mother testified that she has two felony drug convictions and one misdemeanor drug conviction. In March 2006, Mother was placed on deferred-adjudication community supervision for cocaine possession. The offense was committed on August 30, 2005, and was a state-jail felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (b) (West, Westlaw through 2013 3d C.S.). The community supervision was to last five years.

Around November 2007, when M.M. was less than six months old, the Texas Department of Family and Protective Services removed M.M. from Mother because Mother tested positive for cocaine. M.M. was placed with her paternal grandmother for approximately one month and later returned to Mother's possession. At the time, Father lived with the grandmother. When Mother and Father's divorce was finalized in February 2009, Mother was awarded primary custody of M.M.

In May 2010, when M.M. was two years old, law-enforcement officers arrived at Mother's residence looking for Mother's boyfriend, T.B. U.S. Marshals sought to arrest T.B. for possession of amphetamines in violation of his probation. U.S. Marshals entered

3

Mother's apartment with their guns drawn and M.M., who had been sleeping, awoke. According to Mother's description, M.M. became "hysterical."

At the termination trial, Corpus Christi Police Sergeant Gallegos's report concerning the raid was admitted into evidence. According to the report, Sergeant Gallegos, on entering Mother's apartment, saw Mother run to a back patio and attempt to hide items in a red ice chest. The items included small plastic "baggies" for packaging narcotics, $100 in twenty-dollar bills, methamphetamine, and prescription drugs, including hydrocodone.

In her trial testimony, Mother admitted to the sequence of events described in Sergeant Gallegos's report. Mother was arrested for methamphetamine possession and two other men, including Mother's roommate, were questioned at the scene. T.B. was not present. Sergeant Gallegos called Stepmother to the scene to pick up M.M. from Mother's residence and to take M.M. to Father's home.

As a result of her arrest, conviction, and incarceration for methamphetamine possession, Mother's 2005 community supervision was revoked. At the revocation hearing, Mother pleaded "true" to various violations of her community-supervision requirements, including her failure to submit to random drug testing in the months leading up to May 2010 and her failure to participate in and complete a court-ordered Narcotics Anonymous program.

### 3. Mother's Lack of Contact from May 2010 through August 2013

Between the time of M.M.'s removal from Mother's home in May 2010 and the termination trial in August 2013, Mother had no contact with M.M. Mother testified that she no longer knew what M.M. looked like.

Mother admitted that she did not correspond with M.M., send her any presents for birthdays or holidays, or attempt to see M.M., despite knowing M.M. lived with Father. Although the record shows the trial court entered temporary orders in June 2010 allowing for supervised visits up to the time of the termination trial, Mother testified she was unaware of this option. Conversely, Mother also testified that she called an entity called "Family Outreach" about supervised visitation, but the person on the phone told her that Family Outreach no longer provided supervised visitation.

Mother testified that after going to court in August 2011 to face drug charges, she decided not to see M.M. anymore. She believed that it would be difficult for M.M. if the relationship were re-established only to be terminated later. Mother also testified that she provided no financial support for M.M. between the time of M.M.'s removal in May 2010 and the time of the termination trial.

**B.    Stepmother's Testimony**

Stepmother and Father have been married for several years and, together, they have one biological child who is younger than M.M. Stepmother stated that even before M.M. was removed from Mother's home, M.M. would stay with Father and Stepmother for longer than the weekends set forth in Mother and Father's divorce decree. According to Stepmother, Mother would consistently make excuses to not pick up M.M. from Father's home at the end of his visitation periods. Mother would make excuses to leave M.M. with Stepmother and Father for weeks at a time. On these occasions, Father and Stepmother welcomed M.M. to stay with them.

Stepmother testified that M.M. wanted motherly care and attention. Stepmother testified that M.M. is very happy in their home and has recognized Stepmother as her

5

mother since age two. In March 2010, acting on her own initiative, M.M. first started calling Stepmother "Mama." On one occasion when Mother called Stepmother to inform her that she would not be picking up M.M. as scheduled, Stepmother told Mother, "it's important that you realize you're missing out on the most important days of your child's life and she's going to forget who you are if it continues." Stepmother told Mother that M.M. had started calling Stepmother "Mama" and that Stepmother liked it.[5] According to Stepmother, during this conversation, Mother "was silent and she hung up."

A short time later, in May 2010, Sergeant Gallegos called Stepmother, who was at work, and asked her if she could leave work "right away" to pick up M.M. from Mother's residence. Sergeant Gallegos explained that U.S. Marshals had "busted [Mother] with drugs in the house." Stepmother testified that when she arrived at Mother's apartment there were "U.S. Marshals all over the place." Mother was handcuffed, "jumping up and down," and obnoxiously hollering against officer commands. Twice, a marshal looked at Mother and told her that if she did not sit down he would be required "to use excessive force" on Mother. Stepmother described the situation as "really intense" and "very uncomfortable." M.M. was in the middle of this scene "right there on the couch."

Stepmother described M.M. as looking drowsy. Stepmother took M.M. and returned to work with her. Stepmother testified M.M. is an "amazing . . . young lady" whom Father and Stepmother have enjoyed raising ever since her removal from Mother's home. Stepmother also testified that she made arrangements with Family Outreach for M.M. to have visitation with Mother. However, Family Outreach sent Stepmother and Father a letter stating Mother had never made contact with Family Outreach.

---

[5] Stepmother elaborated at trial that she was with M.M. when M.M. started kindergarten, when M.M. lost her first baby teeth, and that she has cared for M.M. when she had nightmares.

## C.    Father's Testimony

Father testified that even when Mother had possession of M.M. (prior to May 2010), M.M. stayed with Father ninety percent of the time and with Mother a "tiny fraction" of the time.  Father testified that because M.M. is his daughter, he did not mind this deviation from the visitation schedule established in the divorce decree.  However, with the assistance of the local police, he documented all deviations from the court-ordered visitation schedule.

Father testified that Mother would leave M.M. at his home for weeks and even months at a time, even though M.M. was only to be in his possession on weekends.  When Mother had M.M. in her possession, she would often call Father and ask him to take M.M. because Mother did not "know what to do with [M.M]."  Mother would also ask Father to pick up M.M. because Mother "could not handle" M.M.  Once, Mother returned M.M. to Father on Mother's Day even though it was Mother's turn to have M.M.  Mother would regularly decline to exercise her right to possession of M.M. on holidays.

According to Father, Mother lacks stability in her life and exercises poor judgment. Since their divorce in 2009, Mother has lived with numerous boyfriends, including a felon. In 2009 and 2010, Father became concerned that Mother was abusing drugs.  Mother's appearance became frail, "very thin," and she developed acne.  Mother always looked like she had "tremors."  Mother kept conversations with Father about M.M. very brief and she would no longer look Father in the eye.  Mother threatened Father that if she did not like how he handled visitation with M.M. she would "get her boyfriend" T.B., "a felon . . ., on [Father]."  Because he suspected Mother was using drugs, starting in early 2010,

7

Father tried to keep M.M. at his home as much as possible. After M.M. was removed from Mother's possession in May 2010, Mother made no effort to contact or visit M.M.

On cross-examination, Father admitted that he was convicted of assaulting Mother when she was pregnant with M.M. According to Father, he did not know Mother was pregnant at the time. The offense was a misdemeanor.

## D. Paternal Grandmother's Testimony

Father's mother testified Mother never contacted her in an effort to visit M.M.

## II. STANDARD OF REVIEW

Involuntary termination of parental rights involves natural and constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). To terminate parental rights, a trial court must find by clear-and-convincing evidence that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1)–(2); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2013 3d C.S.); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

In reviewing the legal sufficiency of the evidence supporting termination of parental rights, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction

that its finding was true." *In re J.L.*, 163 S.W.3d at 85. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could have done so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.* However, we must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings and not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief of the truth of the allegation. *Id.* The evidence is factually insufficient if the disputed evidence that a reasonable fact finder would not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding. *Id.* (citing *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002)). In applying this standard, an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. *Id.*

### III. ENDANGERMENT ANALYSIS

By her second issue, Mother argues the evidence was legally and factually insufficient to support the trial court's finding that Mother engaged in conduct or knowingly placed M.M. with persons who engaged in conduct that endangered M.M.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). We disagree.

Endanger means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 58 (Tex. App.—Corpus Christi 2003, no pet.) (citing

9

*In re M.C.*, 917 S .W.2d 268, 269 (Tex. 1996)); *see In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). It is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See In re M.C.*, 917 S.W.2d at 270. To prove endangerment under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125. The conduct need not occur in the child's presence. *Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.] 2009, pet. denied). The parent's acts do not have to be directed at the child, nor does the child have to actually suffer injury, to constitute conduct dangerous to the child's physical or emotional well-being. *Porter*, 105 S.W.3d at 58 (citing *M.C.*, 917 S.W.2d at 270). The specific danger to the child need not be established independently, but rather may be inferred from the parental misconduct standing alone. *Id.*

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The Texas Supreme Court has acknowledged that a parent's illegal drug use and "its effect on his or her ability to parent may qualify as an endangering course of conduct." *J.O.A.,* 283 S.W.3d at 345. Illegal drug use may support termination under section 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. A fact finder may reasonably infer from a parent's repeated failure to attend scheduled drug screenings that the parent avoided testing because the parent was

10

using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). Further, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

Even though imprisonment, standing alone, does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34; *see In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure the child's safety and well-being, then such incarceration can be a part of a course of continuing conduct. *See In re M.R.*, 243 S.W.3d at 819. Likewise, failure to provide financial support to a child is a factor that may be considered on the issue of endangerment. *See In re S.E.W. & S.A.W.*, 168 S.W.3d 875, 882 (Tex. App.—Dallas 2005, no pet.).

Applying these rules to the present case, we find the evidence legally and factually sufficient to support the trial court's finding that Mother engaged in conduct that endangered M.M.'s physical or emotional well-being. Mother used illegal drugs while M.M. lived with her—when M.M. was an infant and later when M.M. was a toddler. In addition, Mother endangered M.M.'s emotional well-being and exposed her to instability by failing to pick up and care for M.M. when M.M. sought motherly attention and care at the age of two. M.M. spontaneously began to call a third party, Stepmother, "Mama." Mother also lived with T.B., a felon wanted for amphetamine possession, while M.M. was

11

in her possession. This culminated in M.M. becoming hysterical when U.S. Marshals raided Mother's apartment in M.M.'s presence, and Mother then being arrested for methamphetamine possession. From the time M.M. was removed from Mother in May 2010 through the time of the termination trial in August 2013, Mother neither visited nor contacted M.M. Mother admitted she did not even know what M.M. looked like anymore. We overrule Mother's second issue.

In view of our disposition of this issue, we need not reach Mother's first and third issues by which she challenges the sufficiency of the evidence to support the trial court's findings under subsections (D) and (P), respectively.[6] *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (P) (West, Westlaw through 2013 3d C.S.); TEX. R. APP. P. 47.1; *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination was in the child's best interest."); *see also In re C.R.T.H.*, No. 13-13-0032-CV, 2013 WL 1876515, at *5 (Tex. App.—Corpus Christi May 2, 2013, no pet.) (mem. op.) ("In this case, because the trial court found that termination was in the best interest of the child, any of the three unchallenged predicate findings will support the order of termination.").[7]

---

[6] Texas Family Code section 161.001(1)(D) provides a court may order termination of the parent-child relationship if the court finds by clear-and-convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (West, Westlaw through 2013 3d C.S.).

Subsection (P) provides, among other things, that a court may order termination of the parent-child relationship if it finds by clear-and-convincing evidence that the parent used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and failed to complete a court-ordered substance abuse treatment program. *Id.* § 161.001(1)(P)(i).

[7] Mother has not challenged the trial court's finding that termination of her parental rights is in M.M.'s best interest.

## IV. Conclusion

We affirm the trial court's order terminating Mother's parental rights to M.M.


GREGORY T. PERKES
Justice

Delivered and filed the
6th day of March, 2014.