Angel WILSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–03–00060–CV.

Court of Appeals of Texas,
Dallas.

Oct. 7, 2003.

Jason L. Butscher, Brown & Butscher, L.L.P., Sherman, for appellant.

Joseph D. Brown, Grayson County Attorney, Karla Renae Baugh, Assistant County Attorney, Sherman, for appellee.

Before Chief Justice THOMAS and Justices JAMES and KERRY P. FITZGERALD.

## OPINION

Opinion by Justice KERRY P. FITZGERALD.

Angel Wilson appeals the termination of her parental rights. In a single point of error, Wilson argues the evidence at trial was both legally and factually insufficient

to support the termination. For the reasons set forth below, we affirm the trial court's order.

## BACKGROUND

Wilson had been living in Oklahoma before the events leading up to the trial in this case. She came to Texas for an extended visit. While she was in Texas, Children's Protective Services ("CPS") received a complaint concerning Wilson's conduct toward her infant daughter, Andrianna. CPS investigator Marvin Hunt looked into the complaint. Hunt concluded the infant was at high risk in her current situation, and Andrianna was removed from Wilson and placed temporarily in foster care under CPS supervision. CPS caseworker Robin Bethel then developed a service plan with Wilson. The trial court approved the service plan and ordered Wilson (1) to complete a psychological evaluation, (2) to attend parenting classes and anger-management classes, (3) to return to high school or complete her GED, (4) to visit Andrianna, and (5) to pass drug screens.

Ultimately, CPS filed this suit to terminate Wilson's parental rights.[1] The court appointed an attorney for Wilson. The attorney requested a jury trial, but—at Wilson's request—the jury request was withdrawn and trial proceeded before the court.

## EVIDENCE

The first day of trial, the State called three witnesses: Hunt, Wilson, and Bethel. Hunt gave details of his investigation of the referral regarding physical abuse and neglect of Andrianna. He first described going to the address listed in the referral and finding a condemned building without water, gas, electricity, or food; it

was literally falling apart. At the time he visited, Wilson's mother (Andrianna's grandmother) and her boyfriend were living there, but they confirmed that Wilson and Andrianna had lived there until Wilson had a confrontation with the boyfriend a few days earlier. Hunt opined that the home was not a safe environment for anyone, much less a child. Hunt later learned Wilson's mother had "prior problems with her mental history" that could pose a danger to Andrianna. Hunt also learned the boyfriend living with Wilson's mother had a violent criminal history.

Later, Wilson's mother called Hunt and told him Wilson had returned and Andrianna was in immediate danger. Hunt returned and found Wilson living across the street from the condemned residence with a friend, Lisa Kemp. Hunt testified Wilson told him she had hidden Andrianna so CPS could not take her. Hunt said Wilson admitted disciplining Andrianna—who was six months old at the time—by hitting her on her hands or arms. Hunt interviewed Kemp, who told him she had not seen Wilson hit the child but had seen Wilson, on several occasions and in front of a number of people, "lose her temper and shake the baby and throw the baby across the room." Kemp took Hunt to Andrianna, and when he first saw her she was dirty and had untreated insect bites covering every part of her body. Hunt witnessed Andrianna being fed chocolate milk rather than formula; Wilson told him she had been breast feeding her, but because she had no money and was not eating herself, she was unable to produce milk for the baby. Wilson told Hunt that her mother was the one who shook and threw the baby.

1. The putative father's location was unknown at time of trial. He was served by publication, and his rights were also terminated at trial. He is not party to this appeal.

Hunt later learned that CPS in Oklahoma had conducted an investigation of Wilson and concluded that the place she was living there was unsuitable for a child and that Wilson was not bonding with Andrianna. Hunt testified he believed the child was placed in danger by Wilson, that Wilson neglected and physically abused the child, and that it would be in the best interest of the child to terminate Wilson's parental rights and place Andrianna for adoption. On cross-examination, Hunt agreed there appeared to be conflict between Wilson and her mother.

Wilson testified at some length and disputed much of Hunt's testimony. She testified that she was not living with her mother in Texas but was only visiting in the area.[2] She testified that twice when her mother got mad at her, her mother shook Andrianna. She said she did not try to hide Andrianna from CPS and that Kemp had grabbed Andrianna and taken her away over Wilson's protests. She testified that she had never shaken or thrown Andrianna. She claimed that the child had only a few bug bites when Hunt first saw her, and those were being treated. She challenged Hunt's truthfulness, stating she had never told Hunt that she hit Andrianna or that she had hidden her from the CPS or that she could not successfully breast feed her at that time. She said the Oklahoma investigation only occurred because Andrianna "kept getting sick," and Wilson took her repeatedly to the hospital.

However, Wilson acknowledged she never had a permanent residence while she was in Texas; she moved around from place to place. Nor had she found a permanent residence since she returned to Oklahoma. She quit a job as a dishwasher because it did not pay enough, but she did not find another job. She admitted she had not completed a psychological evaluation, was not enrolled in school or working toward her GED, and had stopped attending parenting and anger-management classes, although she knew if she did not do these things there was a good possibility she would not get Andrianna back. She also acknowledged she had not seen her daughter in five months, ostensibly because she could not afford to come from Oklahoma City. She had arranged with CPS to write to Andrianna instead of visiting, but she said she had not been writing anyone because she had been busy. She testified she received a check from Social Security each month, but she could not detail how she spent the money other than on clothes.[3] She admitted using marijuana and cocaine while Andrianna was with CPS, although she testified she only had used drugs a few times when she was living on the streets.[4] She testified she was doing volunteer work at her church, looking for a job, and hoped to be able to afford a place to live when she found work.

Wilson's caseworker at CPS was Robin Bethel. Bethel testified that once the Texas case on Wilson was opened, the Oklahoma case was closed. Bethel confirmed that Wilson had not complied with her service plan as ordered by the court. Bethel observed a number of Wilson's visits

---

**2.** However, on cross-examination Wilson stated that her clothes and Andrianna's clothes were at this residence.

**3.** Wilson testified at one point that she could not afford to comply with the court's order by taking courses and writing to Andrianna because she was trying to save money. But she later testified she did not save any money while she was in Texas, and she had saved only about $200 overall in Oklahoma. Her monthly check during this time was just under $600.

**4.** Wilson testified she obtained the drugs by having a friend prostitute herself for the money.

with Andrianna and concluded Wilson lacked parenting skills. Bethel had concerns about Wilson's ability to bond with Andrianna. Bethel testified she gave random drug tests to Wilson and that Wilson failed the screens three times. In each instance she tested positive for cocaine, and one time she tested positive for cocaine and marijuana. Bethel said Wilson never had a stable place to live and for some time while Andrianna was with CPS, Wilson lived on the streets. She testified she believed Wilson had placed Andrianna in surroundings and had engaged in conduct that endangered her. Bethel cited Wilson's inability to provide a stable and safe home or to take care of herself, as well as her drug use, anger-management issues, and failure to take prescribed medication. She testified to Wilson's failure to maintain significant contact with Andrianna and her failure to comply with the other provisions ordered by the court to obtain the return of Andrianna. Finally, she also testified that she believed it would be in Andrianna's best interest to terminate Wilson's parental rights.

Wilson did not return to court on the second day, but the trial continued. The State called Vickie Penn, a casework supervisor at Court Appointed Special Advocates ("CASA"). Penn testified that Wilson was "very angry and belligerent." Penn confirmed that Wilson had no stable housing and had not completed any of the requirements for return of her daughter. Penn testified to Wilson's lack of desire to do things for herself; she stated CASA believed it was in the child's best interest that Wilson's parental rights be terminated. Penn acknowledged that the relationship between Wilson and her mother was "stormy," and that it was possible Wilson's mother had a motivation to lie about Wilson's conduct with the child.

Wilson did not call any witnesses. Counsel for the State argued in favor of termination; counsel for Wilson argued her parental shortcomings were due to financial difficulties and that Wilson's mother was not a credible witness against her. The trial court ruled at the close of trial, ordering the termination of both parents' rights to the child. The court's order found that Wilson had placed the child in conditions or surroundings that endangered her, engaged in conduct that endangered the child, constructively abandoned the child with CPS, and failed to comply with the court order identifying the conditions necessary for the return of the child to her. The trial court further found that termination was in the best interest of the child.

On appeal, Wilson challenges the sufficiency of the evidence supporting these findings.

### STANDARD OF REVIEW

▉ A court may order involuntary termination only if the court finds that (1) a parent has committed one of a specified list of child-endangering acts or omissions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Given the constitutional magnitude of the interests at stake, the trial court's findings must be made by clear and convincing evidence to reduce the risk of erroneous terminations. *Id.;* *In re B.L.D.,* 113 S.W.3d 340, 351–52 (Tex. 2003).

▉ The supreme court has recently addressed the appropriate standards for appellate courts reviewing the legal and factual sufficiency of findings made under this heightened burden of proof. *See In re J.F.C.,* 96 S.W.3d 256, 265–66 (Tex.2002) (defining the standard of review for legal sufficiency); *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002) (defining the standard of review

for factual sufficiency). In both instances, we ask whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *In re J.F.C.*, 96 S.W.3d at 265–66; *In re C.H.*, 89 S.W.3d at 25. However, in *In re J.F.C.*, the supreme court explained that we must approach the body of evidence differently in legal and factual sufficiency reviews. When reviewing legal sufficiency, we traditionally look at the evidence in the light most favorable to the finding. In the clear-and-convincing context, this means we must assume that the factfinder resolved disputed facts in favor of its finding, if a reasonable factfinder could do so. *In re J.F.C.*, 96 S.W.3d at 266. We must disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* We do not, however, disregard undisputed facts that do not support the finding. *Id.* When reviewing factual sufficiency, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* This means we must look at the disputed evidence and adjudge whether a reasonable factfinder could have resolved that evidence in favor of the finding. The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could *not* have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

### ENDANGERING CONDUCT

 The State alleged four different types of endangering conduct under the statute. According to the State's pleading, Wilson:

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [Section 161.001(1)(D), Texas Family Code]
>
> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [Section 161.001(1)(E), Texas Family Code]
>
> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the department of Protective and Regulatory Services or an authorized agency for not less than six months and: (1) the Department or other authorized agency has made reasonable efforts to return the child to the mother; (2) the mother has not regularly visited or maintained significant contact with the child; and (3) the mother has demonstrated an inability to provide the child with a safe environment; [Section 161.001(1)(N), Texas Family Code]
>
> failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child; [Section 161.001(1)(O), Texas Family Code].

The State was required to prove only one of these examples of endangering conduct to satisfy the first prong of Section 161.001. *In re N.R.*, 101 S.W.3d 771, 775 (Tex.App.-Texarkana 2003, no pet. h.) (citing *In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.-San Antonio 2000, no pet.)).

Initially, there is undisputed evidence from Bethel, Penn, and Wilson herself that Wilson did not comply with a single requirement of the court order establishing

the actions necessary to obtain the return of her daughter. Wilson was not enrolled in school or a GED program; she dropped out of parenting and anger-management classes; she did not maintain contact with Andrianna while the child was in CPS custody; and she repeatedly failed drug tests. Thus, looking at all of the evidence in the light most favorable to the trial court's findings, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Wilson failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her child, who had been in the temporary managing conservatorship of the Department of Protective and Regulatory Services. See Tex. Fam.Code § 161.001(1)(O); see also In re J.F.C., 96 S.W.3d at 266. The evidence is legally sufficient to support the court's finding on this ground.

Wilson claimed her failures to comply were due to financial constraints. The undisputed evidence indicates Wilson received a regular monthly income of just under $600 from Social Security and that she received additional monetary assistance at times from friends and relatives. Wilson did not explain why her income was inadequate to allow her to comply with the court order. Nor did she testify to any attempts to receive assistance from the court in complying with the order—or obtaining relief from it—based on financial difficulty. She simply did not comply. We give due consideration to Wilson's testimony and allow for the fact that the trial judge could have believed her testimony on these issues. But Wilson's economic argument does not create a factual dispute as to her compliance: it is, instead, in the nature of an excuse for her failure to com-

ply.[5] We conclude again that a reasonable trier of fact could have formed a firm conviction or belief that Wilson failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her child, who had been in the temporary managing conservatorship of the Department of Protective and Regulatory Services. See Tex. Fam.Code § 161.001(1)(O); see also In re C.H., 89 S.W.3d at 25. The evidence was factually sufficient to support the trial court's finding under section 161(1)(O).

## BEST INTEREST OF THE CHILD

■■■■ This second portion of our inquiry proceeds from the policy-based presumption that the best interest of a child is usually served by preserving the parent-child relationship. In re J.F.C., 96 S.W.3d at 294; Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). Best interest does not require proof of any unique set of factors, nor does it limit proof to any specific factors. In re H.R., 87 S.W.3d 691, 700 (Tex. App.-San Antonio 2002, no pet.). In determining the child's best interest, the factfinder may consider the current and future physical and emotional needs of the child, the current and future physical and emotional danger the child may confront with her parent, and the parental abilities of the individual seeking custody. Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex.1976) (setting out list of nonexclusive factors to consider when determining best interest of the child).

Looking at all of the evidence in the light most favorable to the trial court's finding that the termination of Wilson's parental rights to Andrianna was in her best interest, we conclude a reasonable

---

**5.** Wilson does not claim that financial difficulty is a legal excuse or defense to her failure to comply with the court order.

trier of fact could have formed a firm belief or conviction that termination was in Andrianna's best interest. *See* Tex. Fam. Code § 161.001(2); *see also In re J.F.C.,* 96 S.W.3d at 266. There was evidence from Wilson's mother and friend that she physically abused Andrianna. There was evidence from CPS workers that Andrianna showed serious signs of neglect when in Wilson's care, including problems involving adequate feeding and emotional bonding. There was evidence Wilson allowed the child to stay for some period of time in a condemned house, with persons who may have been a danger to the child, and that Wilson never maintained a permanent residence either with the child or after the child was removed from her care. There was evidence Wilson used drugs at least three times after Andrianna was removed from her care. There was evidence Wilson's parenting skills were so poor as to endanger the child and that Wilson was not motivated to learn how to improve those skills. Overall, there was evidence Wilson did not place the interest of her child first when making decisions. Thus, the evidence was legally sufficient to establish termination of Wilson's parental rights was in the best interest of Andrianna.

Wilson disputed many of the specifics of this testimony. However, we conclude a reasonable factfinder, observing the demeanor of the witnesses offering this conflicting evidence, could certainly have resolved the disputed evidence in favor of the trial court's best interest finding. Based on our review of the entire record, we conclude a fact finder could reasonably form a firm conviction or belief that the termination of Wilson's parental rights would be in Andrianna's best interest. *See* Tex. Fam.Code § 161.001(2); *see also In re C.H.,* 89 S.W.3d at 25. We conclude the evidence is factually sufficient to support the trial court's best interest finding.

## Conclusion

We conclude that factually and legally sufficient evidence supports the trial court's order terminating Wilson's parental rights. Accordingly, we overrule Wilson's point of error, and we affirm the trial court's order.