

# NUMBER 13-18-00543-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF E.S. and B.S., CHILDREN

**On appeal from the 36th District Court
of Live Oak County, Texas.**

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Rodriguez[1]
Memorandum Opinion by Justice Rodriguez**

This is an accelerated appeal of a September 26, 2018 judgment terminating the parental rights of appellants mother K.S. and father B.S. following a jury trial.[2] The trial court appointed each appellant counsel to prosecute their appeals. By one issue, B.S. contests the trial court's judgment terminating his parental rights asserting that the

---

[1] Retired Thirteenth Court of Appeals Justice Nelda Rodriguez, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (West, Westlaw through 2017 1st C.S.).

[2] We refer to the children's parents by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of the children. K.S.'s counsel has filed a motion to withdraw along with a brief stating that the appeal is without merit and that there are no arguable grounds for reversal. *See Anders v. California*, 386 U.S. 738, 744 (1967); *Porter v. Tex. Dept. of Protective & Regulatory Servs.*, 105 S.W.3d 52, 56 (Tex. App.—Corpus Christi 2003, no pet.) (permitting appointed counsel in a parental termination appeal to file a brief in compliance with *Anders*). We affirm the trial court's judgment and deny K.S.'s counsel's motion to withdraw.

## I. BACKGROUND

On March 20, 2017, the Department of Family and Protective Services (the Department) filed a petition seeking termination of appellants' parental rights to their two children. At the time of the jury trial on July 30, 2018, the children were four and five years old.

### A. The Department's Trial Testimony

Trial testimony established that on February 8, 2017, the Department received a report of neglectful supervision regarding the children, then ages two and four respectively. Specifically, the complainant referenced the use of synthetic marijuana in the presence of the children and the poor health of the children's maternal great-grandmother, Cynthia, who had possession of the children.

When the Department arrived at Cynthia's home, Cynthia informed the Department that K.S. was incarcerated and that she did not know of B.S.'s whereabouts. According to Cynthia, she started caring for the children three months earlier when K.S. dropped them off. B.S. visited the children once, which was a few weeks prior to the Department's visit.

The Department noticed that "there was a mattress and box spring laying in front of the house by a porch and there was trash thrown all around the area and there [were] numerous dogs running back and forth."  One dog had an open wound, and the children were cuddling the dog.  The Department noted that the children had numerous bug bites on their arms and legs, and they were dirty.  The Department was concerned that the home was very cluttered and that there was a lake across from the home.  When the Department questioned Cynthia about reports of the children being too close to the lake, Cynthia responded that she "keeps an eye out" for the children through a sliding glass door.  This posed an additional safety concern to the Department because Cynthia had difficulty moving around and needed the assistance of a walker.[3]

Raymond, Cynthia's eighteen-year-old grandson, also lived in the home.  Cynthia expressed concern about Raymond's use of synthetic marijuana.  When the Department interviewed Raymond, he stated he was aware of Cynthia's poor health but that he could not be there for her because "he wanted to live his life at the time."  Raymond suffered from bipolar disorder and "self-medicated" with synthetic marijuana instead of prescribed medication.  Sometimes Raymond would storm out of the home during the Department's visits.[4]

The Department facilitated a safety plan requiring Cynthia to clean the home and prohibit Raymond from being a caretaker of the children.  On March 1, 2017, Cynthia advised the Department that B.S. was at her home.  The Department went to Cynthia's home and encountered Raymond who appeared to be under the influence of a drug.  Law

---

[3] According to the Department, emergency medical services had been called to Cynthia's home several times because of her health.

[4] According to the Department, there were also reports of Raymond acting violent towards the dogs and of striking the children with a belt; however, the children did not appear bruised or otherwise marked.

3

enforcement arrived and apprehended Raymond.

It appeared that B.S. was living in a nearby storage unit next to Cynthia's house. When B.S. noticed the presence of the Department and law enforcement, he fled and could not be found. B.S.'s girlfriend, Zandra, who was also involved in a case with the Department, was at the home as well and appeared to be under the influence of a drug.

After the Department's investigation, the Department concluded that Cynthia was unable to physically care for the children and that the children's physical and emotional well-beings were in danger. The Department attempted to contact B.S. on numerous occasions but was unable to reach him. When the Department visited K.S. in jail, she expressed concern about the children being in Cynthia's care but stated there were no other options as B.S.'s mother was also an addict, K.S.'s mother was disqualified from caring for the children due to her criminal history, and neither K.S. nor B.S. had a home. The Department concluded that appellants endangered the lives of their children by leaving them in Cynthia's care despite their awareness of her poor health and by exposing the children to Raymond's synthetic use of marijuana.

## B. K.S.'s Trial Testimony

K.S. testified that she was twenty-five years old when she and B.S. started using methamphetamine. Before that, she and B.S. would smoke "a little bit of weed and synthetic [marijuana] here and there" when B.S. would get out of work.

K.S. was charged with a felony and a misdemeanor in December of 2016. According to K.S., the children were "just visiting" Cynthia when K.S. was arrested and incarcerated for possession of methamphetamine.[5] In January of 2017, she was charged

---

[5] K.S. later testified that she and B.S. made the decision to leave the children in Cynthia's care because she "needed for them to have a stable house. [She] wasn't going to drive them from place to place . . . ."

4

with three counts of possession of a controlled substance, a state jail felony; possession of a controlled substance, a misdemeanor; possession of a prohibited weapon, a misdemeanor; and a motion to revoke. When the Department visited K.S. in jail in February of 2017, K.S. expressed concern about Cynthia's health, but she did not believe the children were in any danger. In fact, she said there was "no way" the children would go down to the lake unsupervised because "they are terrified of the lake," and "they think they are going to get eaten" by catfish. She was aware of the bug bites on the children and stated they would get bitten because they played outside. Moreover, she testified that Raymond had been using synthetic marijuana for a couple of years and it changed who he was; he became mean.

K.S.'s court ordered service plan ordered K.S. to do the following within 120 days: (1) participate in a psychological evaluation, (2) complete parenting classes; (3) complete anger management, and (4) attend individual counseling. Additionally, K.S. was required to obtain a home, get a job, submit to random drug testing, complete a drug and alcohol assessment, and attend supervised visitation with the children. Her service plan goals also ordered that K.S. demonstrate an ability to protect the children from harm, stay sober, provide the children with necessities, and put the children's needs ahead of her own. K.S. failed to comply. In fact, she testified that she has not done anything to comply with her service plan. Instead, when K.S. was released from jail, she rented a room in a friend's house. To earn a living, she cleaned and painted apartments.

In August of 2017, K.S. was arrested again for failure to appear. Following her release, the Department set up a visit with her children but K.S. failed to attend. The children were present and expected to see their mother. K.S.'s failure to appear upset the children and they cried while being transported back home. The department suspended

K.S.'s visitations after she failed to appear for two appointments. K.S. was arrested once more for another failure to appear, and she relapsed on methamphetamine. According to K.S. she wanted to engage in the services required of her, but a lack of transportation precluded her from doing so.[6]

K.S. had not seen the children in over a year. Although she missed them, she knew they were now in foster care and were well cared for. K.S. testified that she never enrolled in a treatment plan, and she did not complete any of the required parenting classes. She attended some alcoholic anonymous classes but did not complete them. When asked where she was going to live when released from jail, she responded that she did not know because "I can't predict the future. I don't know what is going to be going on whenever I get out . . . I could get hit by a bus on the way back to the jail." She was unsure about staying at her father's house or a recovery house.[7] K.S. testified that she is currently sober, "but can I say I don't think about it? No." Nonetheless, she hopes her children are returned to her because they have been in the foster system for too long. She asked the jury to give her another chance to complete the services requested of her and stated "If I screw up, [the Department] will take them back away. Just let me have one more chance."

## C.     B.S.'s Trial Testimony

B.S. testified that he and K.S. are methamphetamine users. He started using methamphetamine two years ago, which he conceded was the worst thing he could have done. Although B.S. and K.S. were never "high" in front of the children, B.S. testified that

---

[6] According to the Department, the counselors travel to the location of the parent needing services. If the parent prefers, the sessions can be held in a public place. Moreover, if the parent lacks transportation, the Department offers bus tickets for the parents to attend visitation.

[7] K.S. testified that her father was just released from federal prison.

at times, they were under the influence in front of the children. When he became addicted to the drug, he became very paranoid. He and K.S. made the decision to place the children in Cynthia's care because he and K.S. did not have a residence of their own. At one point, in the presence of the children, B.S. got into a physical fight with Raymond because Raymond was high on synthetic marijuana. B.S. testified he knew about Cynthia's poor health, but no other relatives would agree to provide for the children, and his mother was also an addict. He admitted that he engaged in criminal activity to provide for his addiction and for the children.

Because B.S. did not attend the family plan of service conference scheduled by the Department, the Department created one for him. Like K.S.'s service plan, B.S.'s service plan ordered B.S. to do the following within 120 days: (1) participate in a psychological evaluation, (2) complete parenting classes; (3) complete anger management, and (4) attend individual counseling. Additionally, B.S. was required to obtain a home, get a job, submit to random drug testing, complete a drug and alcohol assessment, and attend supervised visitation with his children. His service plan goals included B.S. demonstrating an ability to protect the children from harm, staying sober, providing the children with necessities, and putting the children's needs ahead of his own. B.S. only attended two parenting classes, tested positive for methamphetamine, checked himself into an inpatient treatment facility only to check himself out, and was charged with forgery of a financial instrument. He confirmed he was also charged with multiple counts of exploitation of the elderly.

Moreover, B.S. became emotional during supervised visits with the children. One visit resulted in B.S. being escorted out of the premises by police officers because of an argument that ensued with the Department. B.S. admitted to using drugs at the time.

7

The trial court found that B.S. did not comply with the service plan and suspended his visits until he completed parenting classes and provided negative drug tests. He submitted to one drug test, but it was positive for methamphetamine. B.S. testified that he knew he needed to comply with the parenting classes, but he did not do so because he did not want to get arrested. Three months later, he was incarcerated again.

B.S. testified he is currently taking substance abuse education courses, alcoholics and narcotics anonymous classes, and parenting classes at a treatment facility. He has completed six of ten parenting classes. B.S. also participates in weekly individual and group counseling. When asked what he has completed on his service plan, B.S. responded that he completed the psychological evaluation at the treatment facility and is drug-tested every two weeks. He acknowledged that he did not participate in the treatment services offered by the Department, explaining "[i]t took being incarcerated to be, forcibly clean, to stay clean, sadly." He explained that he will likely suffer from addiction for the rest of his life. B.S. agreed that the best place for the children is with the foster family that is currently providing for them. Although he had not seen the children in over a year, he testified he was going to try his best not to relapse and asked the children to wait for his release. Upon his release, he plans to establish a home with Zandra and their newborn, though he confirmed she used to be an addict and has a history with the Department as to her other children.

## D. Foster Family

According to the Department, the children were "doing great" in a new foster-to-adopt home. The Department chose this family because the family is financially stable, maintains a stable environment, wants to adopt the children, and cannot have any children of their own. The children have bonded with their foster parents and are happy

in the foster home. According to the Department, the children have not asked about appellants or asked to see them. In fact, the children want to change their last name to that of their foster family. The Department confirmed that the children want a forever family. They are in a loving home and would be unhappy if they were taken out of their foster home because they have adjusted to their new lives.

The foster family is working on the children's language development, and they participate in daily educational activities. The foster mother took time off from work in order to spend more time with the children. She testified that she is employed as a "parenting teacher" and has a degree in family child development. She explained that she works with families on child development and family well-being and provides parental support. She stated that the children feel excited to get home from school and that her mother and aunt provide extra support for the children. The children have adjusted well and sleep through the night. She confirmed that she and her husband want to adopt the children should they become available for adoption because they feel like the children "already are part of our family." Even if appellants' rights were not terminated, the foster family would continue to care for and provide for the children and would love for the children to continue to live in their home.

### E.      Judgment

After a three-day jury trial, the jury found by clear and convincing evidence that K.S. and B.S. had:  (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; (3) constructively abandoned the children who had been in the permanent or temporary managing

9

conservatorship of the Department for not less than six months and the Department had made reasonable efforts to return the children to appellants and appellants had failed to regularly visit or maintain significant contact with the children, and failed to provide the children with a safe environment; and/or (4) failed to comply with the provisions of a court order that specifically established the actions necessary for appellants to obtain the return of the children, who were in the permanent or temporary managing conservatorship of the Department for not less than nine months because of the children's removal for abuse or neglect. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (N), (O) (West, Westlaw through 2017 1st C.S.). The jury further found by clear and convincing evidence that termination of appellants' parental rights was in the children's best interest. *See id.* § 161.001(b)(2). The trial court entered a judgment consistent with the findings of the jury and terminated appellants' parental rights.

This appeal followed.

## II.    TERMINATION OF B.S.'S PARENTAL RIGHTS

By his sole issue, B.S. asserts that the record is legally and factually insufficient to support a finding that termination was in the children's best interest.[8]  Specifically, B.S. contends his parental rights were "terminated entirely based on conjecture, hearsay, and non-expert opinion . . . instead of real evidence." However, B.S. does not challenge, and therefore concedes, that the evidence was sufficient to terminate his parental rights under at least one of the predicate grounds found by the jury.

---

[8] A claim that the evidence presented during a jury trial was factually insufficient must be preserved through a point in a motion for new trial. *See* TEX. R. CIV. P. 324(b)(2); *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet). The record reflects that B.S. did not file a motion for new trial and consequently failed to preserve his factual sufficiency complaint. *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 604 (Tex. 2012) ("When a party fails to preserve error in the trial court or waives an argument on appeal, an appellate court may not consider the unpreserved or waived issue."). Accordingly, we overrule his argument that the evidence was factually insufficient.

## A.    Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.— Corpus Christi 2010, no pet.). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). The Family Code requires that the jury find, by clear and convincing evidence, that termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2) (West, Westlaw through 2017 1st C.S.). The clear and convincing standard is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007 (West, Westlaw through 2017 1st C.S.).

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re J.L.,* 163 S.W.3d at 85; *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.,* 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code subsection 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re J.L.*, 163 S.W.3d at 84.

**B.      Analysis**

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131 (West, Westlaw through 2017 1st C.S.); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Factors that we consider in determining whether termination of parental rights is in the child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in a child's best interest. *Id.* at 28.

As to the first factor, the desires of the children, the Department testified that the

children do not talk about appellants, nor have they asked for them. Instead, they "are thriving" and have bonded with their foster family. Additionally, the foster family testified that the children are excited about where they are now and "already are part of our family." Moreover, at the time of trial, the children had not seen appellants in over a year. This factor weighs in favor of termination.

As to the second factor, the emotional and physical needs of the children now and in the future, B.S. testified that it would be at least seven more months before he graduated from the treatment facility, but later testified that it is debatable as to how long he will be in that facility. Nonetheless, he testified that he was going to try his best not to relapse. This factor weighs in favor of termination.

Relevant to the third and eighth *Holley* factors—emotional and physical danger to the children and acts or omissions which may indicate an improper parent-child relationship—is B.S.'s history of drug use, criminal activity, and incarceration. *See In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.) (holding that current and future incarceration of a parent is relevant to his ability to meet a child's present and future physical and emotional needs). Further, appellants allowed the children to stay in the care of someone with poor health and who also housed a synthetic drug user. B.S. tested positive for methamphetamine and admitted he cared for the children while under the influence, though this is somewhat mitigated by the fact that B.S. is currently in a treatment facility, attending alcoholics anonymous classes, narcotics anonymous classes, and parenting classes. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that a parent's drug use supports a finding that termination is in the best interest of the child); *see also In re N.L.D.*, 412 S.W.3d 810, 823 (Tex. App.—Texarkana 2013, no pet.) ("Evidence that a person has recently improved her life weighs

against a finding that termination is in the best interest of the child.").

Nonetheless, appellants testified that they will more than likely suffer from addiction for the rest of their lives. Additionally, there was evidence that the children were dirty, suffered from bug bites, and that B.S. would break down in the presence of the children during his supervised visits, risking emotional harm to the children. The jury was free to infer that B.S.'s drug use and outbursts were affecting the children and could be interpreted as a threat or danger to them. *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (holding that the fact finder has the sole authority to weigh evidence, draw reasonable inferences therefrom, and choose between conflicting inferences). These factors weigh in favor of termination.

The aforementioned evidence is also relevant to the fourth *Holley* factor, regarding parenting abilities of the parties seeking custody and the sixth factor, regarding plans for the children by the parties seeking custody. It is undisputed that appellants failed to comply with their service plans. The fact that a parent has poor parenting skills and "was not motivated to learn how to improve those skills" is evidence supporting a finding that termination is in the child's best interest. *Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.). Thus, the jury could have inferred that appellants were unmotivated to learn how to improve their parenting skills. *Id.* According to the department, B.S. failed to demonstrate service plan goals, has never made a change on his own, and only did so because he was incarcerated. In fact, when B.S. tested positive for methamphetamine, he checked himself into a rehab facility only to check himself out without completing the program. B.S. intentionally avoided and hid from the Department because he was on drugs, showing no concern that the children could possibly be removed. Additionally, B.S. has no home but testified that he planned to establish a home

14

with Zandra and raise the children. He confirmed that Zandra has a history with the Department as to her own children because Zandra used to be an addict as well. Moreover, when the Department met with Zandra at Cynthia's home, Zandra appeared to be under the influence. In light of this, our consideration of the fourth and sixth *Holley* factors weigh in favor of termination.

As to the fifth *Holley* factor, programs available to the parties seeking custody, it is undisputed that appellants failed to comply with the tasks required of them in their service plans. There was no other evidence adduced relevant to this factor. This factor weighs slightly in favor of termination.

As to the seventh *Holley* factor, regarding the stability of the home or proposed placement, a child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). A fact finder may consider the consequences of the failure to terminate parental rights and that the children's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result. *See In re K.C.*, 219 S.W.3d at 931. A parent's inability to provide adequate care for his children, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.).

Here, appellants failed to provide the children with a stable home. The evidence established that the children are happy, healthy, and thriving in their current foster placement. The foster family intends to adopt the children and make them part of their family. B.S., on the other hand, testified that he and K.S. did not have a residence and

15

were bouncing around from place to place due to their drug use. Further, B.S. testified that he is currently in a treatment program as a condition of his probation for forgery of a financial instrument. He explained that if he failed to complete the program, he would be charged with absconding and his probation would be revoked. Although he does not have a place to live, he plans to establish a home should he graduate from the program. As an addict, he needed to place himself before his children so that he can better himself. *See In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (holding that a fact finder is free to reject a parent's assertions of future stability and of having learned from his mistakes). Consideration of the seventh *Holley* factor weighs in favor of termination.

We finally address the ninth factor, excuses for the acts or omissions of the parent. B.S. conceded that he intentionally avoided contact with the Department throughout their investigation because he was an addict and did not want to face them. Consequently, the Department was unable to reach him. Cynthia testified that while the children were in her care, B.S visited the children "a few weeks ago" but had not returned. B.S. admitted breaking down in front of the children during his supervised visits and getting into an altercation with the Department which resulted in suspension of his visits. Moreover, he engaged in criminal activity to minimally provide for the children's needs. B.S. acknowledged that he was an addict and that it was his worst decision. He blamed his use of methamphetamine on the loss of his job and arguments with K.S. but also testified that prior to using methamphetamine he was using synthetic marijuana. The jury may have considered that appellants had opportunities to foster parental relationships with the children, but instead chose to engage in criminal activity which resulted in incarceration. *See Wilson*, 116 S.W.3d at 930. Consideration of this factor weighs in favor of

16

termination.

Overall, having considered the trial record in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have formed a firm belief or conviction, based on clear and convincing evidence, that termination of appellants' parental rights was in the children's best interest. *See In re J.L.,* 163 S.W.3d at 85. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See In re J.F.C.*, 96 S.W.3d at 266. In particular, the jury could have reasonably concluded that, if termination were not ordered, the children would suffer because they would be removed from their current placement, in which they are thriving. *See In re K.C.,* 219 S.W.3d at 931. Accordingly, we find that the evidence was legally sufficient to rebut the strong presumption that keeping the children with their biological parents is in their best interest. *See* TEX. FAM. CODE ANN. § 153.131. B.S.'s sole issue is overruled.

### III.    TERMINATION OF K.S.'S PARENTAL RIGHTS

#### A.    Anders Brief

Pursuant to *Anders v. California*, K.S.'s counsel filed a brief stating that her review of the record yielded no grounds of reversible error upon which an appeal can be predicated. *See* 386 U.S. at 744. Generally, "an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities." *In re Schulman*, 252 S.W.3d 403, 407 n.9 (Tex. Crim. App. 2008). Although counsel has not provided record references, procedural history, and set out pertinent legal authorities, counsel stated that there was no jurisdictional error; no harmful evidentiary or procedural error; no adverse rulings to objections; no error in the charge or judgment; and that trial counsel for K.S. was effective. Thus, we are satisfied that counsel has diligently

17

investigated the possible grounds of appeal. *See Anders,* U.S. at 742; *see also In re Schulman*, 252 S.W.3d at 409 n.23.

Counsel has also informed this Court that appellant has been (1) notified that counsel has filed an *Anders* brief; (2) provided with a copy of the *Anders* brief; (3) informed of her right to file a pro se response and review the record preparatory to filing that response[9]; and (4) provided with a pro se motion for access to the appellate record. A reasonable amount of time has passed, and we have not received a pro se response from appellant.

## B. Independent Review

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the case is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80 (1988). A court of appeals has two options when an *Anders* brief is filed. After reviewing the entire record, it may: (1) determine that the appeal is wholly frivolous and issue an opinion explaining that it finds no reversible error; or (2) determine that there are arguable grounds for appeal and remand the case to the trial court for appointment of new appellate counsel. *Bledsoe v. State*, 178 S.W.3d 824, 826–27 (Tex. Crim. App. 2005). If the court finds arguable grounds for appeal, it may not review those grounds until after new counsel has briefed those issues on appeal. *Id*.

We have reviewed the entire record and counsel's brief, and we have found nothing that would arguably support an appeal. *See id.* at 827–28 ("Due to the nature of

---

[9] In the criminal context, the Texas Court of Criminal Appeals has held that "the pro se response need not comply with the rules of appellate procedure in order to be considered. Rather, the response should identify for the court those issues which the indigent appellant believes the court should consider in deciding whether the case presents any meritorious issues." *In re Schulman*, 252 S.W.3d 403, 409 n.23 (Tex. Crim. App. 2008).

18

*Anders* briefs, by indicating in the opinion that it considered the issues raised in the briefs and reviewed the record for reversible error but found none, the court of appeals met the requirement of Texas Rule of Appellate Procedure 47.1."); *Stafford v. State*, 813 S.W.2d 503, 509 (Tex. Crim. App. 1991). There is no reversible error in the record.

## C. K.S.'s Counsel's Motion to Withdraw

K.S.'s counsel has asked this Court for permission to withdraw as appellate counsel. However, the Texas Supreme Court has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.,* 520 S.W.3d 24, 27 (Tex. 2016*).* Accordingly, counsel's obligation to K.S. has not yet been discharged. *See id.* Counsel's motion to withdraw is therefore denied. *See id.* If K.S., after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.*

## VI. CONCLUSION

We affirm the trial court's judgment.

NELDA RODRIGUEZ,
Justice

Delivered and filed the
28th day of February, 2019.