

In The

Court of Appeals

Seventh District of Texas at Amarillo

No. 07-22-00083-CV

IN THE INTEREST OF M.D.W., JR., A CHILD

On Appeal from the 316th District Court
Hutchinson County, Texas
Trial Court No. 44,472, Honorable James M. Mosley, Presiding

July 26, 2022

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellant, A.G.,[1] appeals from the trial court's order terminating her parental rights to her son, M.D.W., Jr. By a single issue, she challenges the sufficiency of the evidence to support the trial court's best-interest finding. We affirm.

**Background**

A.G. has a history with appellee, the Texas Department of Family and Protective Services, that began immediately following the birth of M.D.W., Jr. in June 2017. Four

---

[1] To protect the privacy of the parties involved, we refer to them by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); *see also* TEX. R. APP. P. 9.8(b). The father's parental rights were also terminated but he did not pursue an appeal.

previous cases of allegations of neglectful supervision were ruled out, and the cases were closed. A family service plan was developed for A.G. The underlying case is the fifth case involving the Department and resulted in termination proceedings.

A.G has mental health issues involving her cognitive development. She struggles with memory issues. She receives disability benefits but not for any physical disabilities. After M.D.W., Jr.'s birth, the Department received a referral of neglectful supervision out of concern that A.G. would not be able to care for a newborn.

A.G. abuses marihuana and while the child was in the Department's care, A.G. had several positive drug screens. She and her paramour have a history of domestic violence which resulted in numerous trips by law enforcement to their apartment prior to the child's removal. In February 2020, law enforcement was dispatched to the home on a domestic disturbance call. A.G. and her paramour had been arguing.

According to the police report, the paramour was extremely intoxicated and agitated. He acted aggressively toward the officers. He was handcuffed and arrested for allegedly assaulting A.G. She told the officers that her paramour had placed his hands on her neck and left a mark. She claimed that she scratched her paramour which the officer interpreted as acting in self-defense. The paramour was charged with assault family violence for intentionally, knowingly, and recklessly causing bodily injury to A.G. "by grabbing her by the face." A.G. later claimed that she had not been assaulted and that her paramour had been wrongfully arrested. The record does not reflect the disposition of the case filed against the paramour.

In the months that followed, police officers were dispatched to A.G.'s home on several occasions. On June 29, 2020, neighbors complained of "a couple yelling" but the

responding officer found that no offense had been committed. On September 22, 2020, an officer was dispatched for an incident involving A.G.'s paramour and his sister. Although the paramour was highly intoxicated, there was insufficient information to determine whether an offense had occurred. Three days later, officers were again dispatched for a verbal disturbance involving A.G. and her paramour. A.G. denied that any violence had occurred, and one of the officers did not observe any physical injuries. However, the paramour was advised that law enforcement had been dispatched to the residence too many times to believe the threat of violence would be diminished once they left. The paramour was instructed to gather some belongings and was escorted to a separate location.[2]

In November 2020, the Department removed M.D.W., Jr. from his mother and placed him with an aunt after an allegation of neglectful supervision. The child, then three years old, had left the home alone and walked barefoot across a "busy highway." According to A.G., her stepfather was watching the child at the time but unbeknownst to her, he left while she slept.

After the child's removal, the Department filed its original petition for termination on November 9, 2020, and implemented a family service plan. Due to the COVID-19 pandemic, most services were available online and A.G. had access to the internet. However, according to the caseworker, A.G. did not begin her services until November 2021, a year after the child's removal. She struggled to perform the services despite the caseworker repeatedly explaining them to her.

---

[2] The police reports do not mention whether A.G.'s son was present in the home during the incidents although the record establishes that the child was not present during the February 2020 incident.

3

The caseworker testified that A.G. was evicted from her home and was living with her mother during the proceedings. A.G.'s only source for financial support came from disability payments. The caseworker, however, testified that A.G. is not physically disabled or unable to work. She further testified that A.G. had not established six months of sobriety or stable housing and had not acquired the skills necessary from services to manage her anger. The reasons for the child's removal had not been alleviated.

A.G.'s visitation with her son was suspended for positive drug screens for marihuana in January and February 2021. The caseworker testified that A.G. had been arrested and jailed for domestic violence committed against her paramour. A.G. intended to continue the relationship with him even though they were living separately at the time of the final hearing. Her intention to continue the relationship caused the caseworker concern for the child's safety. A.G. also failed to complete most of her services. When the caseworker was asked whether she believed that A.G. could provide a safe and stable environment for the child, she replied, "No." She also expressed concern about the child's emotional and psychological well-being if he was returned to A.G. She testified that termination of A.G.'s parental rights was in the child's best interest.

To that end, the caseworker expressed that the child's current placement with his aunt was providing him with a safe and stable home, and the aunt expressed an interest in adopting him. Other children are present in the home, and the child has bonded with them and his aunt. According to the caseworker, the aunt was meeting the child's medical, dental, and psychological needs.

After the Department presented its evidence and rested, A.G. was the only witness for her case-in-chief. She confirmed that she had not been able to complete her services.

4

She testified that she is "slow at reading" and receives disability as her only source of income. She confirmed that she is not physically disabled but does not work because she is scared, anxious, and forgetful. When asked about her child walking alone to a convenience store, she testified "[t]hey said somebody walked my kid to Allsup's, and then I just don't understand. Like, they say so many things, that he was by himself, and they said that there was somebody walking with him." She then explained that her stepfather was supposed to be watching her son while she slept but he had left without informing her.

A.G. testified that termination of her parental rights would not be in her child's best interest. However, she testified that she tried not to use drugs but continued to do so because of her anxiety. She further testified that she was not currently living with her paramour but intended to continue the relationship with him and live with him in the future. During cross-examination, she acknowledged the multiple incidents of domestic violence and conceded that such an environment would not be safe for her child. She also testified that, although she lived with her mother and that her child could live there too, her sisters declined to help her when she reached out to them. She had no other support from family besides living with her mother.

Following closing arguments, the trial court found that A.G. (1) knowingly placed or knowingly allowed her child to remain in conditions which endangered his physical and emotional well-being; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered his physical or emotional well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of her child. The trial court also found that

5

termination of A.G.'s parental rights was in her child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), and (O), (b)(2).

### *Applicable Law*

The Texas Family Code permits a court to terminate the relationship between a parent and a child if the Department establishes one or more acts or omissions enumerated under section 161.001(b)(1) of the Code and that termination of that relationship is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). The burden of proof is by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Only one statutory ground is needed to support termination though the trial court must also find that termination is in a child's best interest. *In re K.C.B.*, 280 S.W.3d 888, 894–95 (Tex. App.—Amarillo 2009, pet. denied). In reviewing a termination proceeding, the standard for sufficiency of the evidence is that discussed in *In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014). In reviewing a best-interest finding, appellate courts consider, among other evidence, the factors set forth in *Holley*, 544 S.W.2d at 371–72.

### *Best Interest*

A.G. does not challenge any of the statutory grounds for termination, and as a result, the trial court's findings related to those grounds are final. However, she does question the sufficiency of the evidence to support the trial court's best-interest finding.

To assess the trial court's best-interest finding, we consider factors enumerated in the non-exhaustive list set forth in section 263.307(b) of the Family Code. Additionally,

the Supreme Court has set out other factors to consider when determining the best interest of a child. *See Holley*, 544 S.W.2d at 371–72. Those factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the best interest of the child; (6) the plans for the child by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* The absence of evidence of one or more of these factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See id.* at 28; *see also In re E.C.R.,* 402 S.W.3d 239, 249–50 (Tex. 2013). The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Additionally, a child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

### Analysis

Although A.G. does not challenge the trial court's finding that she failed to comply with the family service plan by performing all the required services to obtain the return of her child, her performance under that plan is relevant to some of the *Holley* factors. *In re S.A.M.*, No. 04-18-00607-CV, 2019 Tex. App. LEXIS 1020, at *16 (Tex. App.—San Antonio Feb. 13, 2019, pet. denied) (mem. op.). A parent's actions or inactions with regard to a family service plan is relevant to a child's best interest. *Id.*

The record establishes that A.G. began a history with the Department immediately after her son's birth and termination of her parental rights was delayed for approximately four years. After four previous cases with the Department, the fifth case, which resulted in termination, was the last resort available to safeguard A.G.'s child.

The evidence presented raises concerns about A.G.'s parental abilities to care for her child and provide him with a safe and stable environment. The caseworker testified that she repeatedly explained the Department's service plan to A.G., who did not even attempt to begin services until almost a year after suit for termination had been filed. Such conduct shows a lack of inspiration to improve parenting skills. *See Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.) (finding that a parent's lack of motivation improving parenting skills is evidence supporting a best-interest finding).

The evidence showed that A.G. was evicted from her apartment and did not work. She relied solely on disability for financial support. She did not have a support network to assist in caring for her child. Although A.G. acknowledged that incidents involving domestic violence would not be a safe environment for her child, she intended to continue the relationship with her paramour which caused safety concerns with the caseworker.

8

A.G. also struggled with her sobriety and continued to use marihuana. She allowed her child to be cared for by her stepfather. That resulted in the three-year-old child being left alone and crossing a street by himself.

The caseworker established that the child has been with a relative placement, an aunt, and is well-bonded with her and with other children in the home. The aunt is providing a safe and stable home and is satisfying all the child's needs. She has expressed an interest in adoption. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (finding that when the child is too young to articulate her desires, evidence of being well-cared-for and bonded with a family seeking adoption supports the best-interest finding), *overruled in part on other grounds*, *In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Based on the evidence presented, we conclude that the trier of fact could form a firm conviction and belief that the best interest of the child supports termination of the parental relationship. A.G.'s sole issue is overruled, and the trial court's *Order of Termination* is affirmed.

Per Curiam