**AFFIRMED and Opinion Filed November 22, 2024**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-24-00639-CV**
_____

**IN THE INTEREST OF B.M. AND M.M., CHILDREN**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-30022-2023**

## MEMORANDUM OPINION

Before Justices Goldstein, Garcia, and Miskel
Opinion by Justice Goldstein

Father appeals the termination of his parental rights. In seven issues, Father argues "[t]he evidence was insufficient to overcome the fit parent presumption"; the evidence was legally and factually insufficient to support termination under Texas Family Code sections 161.001(b)(1)(D), (E), (O), and (P) or to support the trial court's finding that termination of Father's parental rights was in the children's best interest; and he received ineffective assistance of counsel. We affirm the trial court's judgment.

## Background

B.M. was born in January 2012, and M.M. was born in October 2013. In March 2023, the Texas Department of Family and Protective Services (the Department) filed an original petition for protection of the child(ren), for conservatorship, and for termination in suit affecting the parent-child relationship. The petition alleged, among other things, that Father had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children in violation of family code section 161.001(b)(1)(D); (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children in violation of family code section 161.001(b)(1)(E); (3) failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the children in violation of family code section 161.001(b)(1)(O); and (4) used a controlled substance as defined by Chapter 481 of the Texas Health and Safety Code in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program in violation of family code section 161.001(b)(1)(P). On March 6, 2023, the trial court appointed the Department temporary managing conservator of the children.

At trial in April 2024, Celina police detective Will Stone testified that he was called to Father's residence on a "burglary report" on March 4, 2023. Father reported

that someone had broken into his home or "had been staying in his home without his knowledge and had stole[n] something from his house." When Stone first made contact with Father, Father appeared "very manic and paranoid," and Stone was concerned that Father's "manic behavior was indicative of the use of methamphetamines [sic]." When Stone began taking photographs of Father's home and checking "for any kind of forced entry," Stone smelled the odor of marijuana in the master closet. Stone asked Father about the smell, and Father said "he does use marijuana but he had thrown it all away" the night before. Father took Stone outside and "jumped into the trash can, so to speak, half of his body, and pulled a bong out of the trash can."

Father consented to Stone's search of the house, and Stone found marijuana in an open backpack in the master closet "on a shelf approximately four feet off the ground." Also in the closet Stone found evidence that the children "had built a fort in the back of the closet" and had "snacks and toys and sleeping bags" in the back of the closet. In response to questioning, Father said the marijuana belonged to him, and Stone arrested Father for possession of marijuana. There were no other caregivers for the children present in the house, and CPS became involved. The children were instructed to "pack some bags." The children had trouble finding clean clothes, and they were "going into the laundry room" where there was "marijuana shake" on the floor. The children were "walking on top of the marijuana," and Stone

was concerned "that this marijuana was also accessible to the children." Some of the marijuana from the floor of the laundry room was on the children's clothes.

Stone testified that some of Father's statements led Stone to have concerns for Father's mental health. Specifically, Father said that "he had a man staying with him for a couple of days beforehand that possibly had put something in his children's drinks." The children "said the same thing," causing Stone concern that the children "had been exposed to drugs other than marijuana."

On cross-examination, Stone testified it was not only Father's "manic behavior" that led him to believe Father had used methamphetamine; Stone also considered "the statements that were made about the crystal substance that was seen in one of the children's drinks." In addition, Stone believed Father was "under the influence" based on statements Father made concerning people that "were after him and his family because of a large sum of money that he may have received."

Latricia Spencer, a night response worker with Child Protective Services, testified she received a "report for neglectful supervision" regarding Father on March 4, 2023. Spencer made contact with Father at the Collin County Jail. Father was "pretty paranoid" and "continued to mention that some people were out for him, he was being followed; they were out for him about this inheritance." Father said that he "had a million dollar inheritance that people were after him for." Father told Spencer that he and the children had lived in Texas for a year and lived in California previously.

–4–

Spencer ran CPS and criminal history for the family as part of her investigation, and she found that, in 2019, "there was some substantiated history for neglect on all three children" that Father had. The history indicated that "the child welfare services in California found that [Father] did indeed neglect the children." Father "mention[ed] that he had CPS history there and it went on for 10 years, but he didn't go into details about the case." Father also stated that the children's mother was deceased, "but he didn't go into details about how." After the mother's death, Father "got the children and drove here from California." Father stated he "wants the boys to be on a great soccer team," so "he decided to go with" the FC Dallas team, and that was why he moved here. Father identified his "relatives or support system in the area" as "the coach for the FC Dallas team and also a neighbor." Father was unable to provide contact information for the coach he wanted the children to be placed with, but he directed Spencer to look on the "FC Dallas website for the coach's information and try to call that number." Father also had no contact information for the neighbor. Spencer looked up the coach on the website and called three times, "but there was no response back or reply back."

In his conversation with Spencer, Father denied he had any mental health diagnosis, stated that someone broke into his home and "he just wanted to make a report about a burglary," and speculated that he thought someone "planted" the marijuana in his home. Father admitted to past marijuana use and indicated he had last used marijuana "three or four days ago." Father denied using methamphetamine,

"but he did make the statement that if he did or tested positive for it, someone may have put it in his drink or food." Father mentioned having a daughter in California who "wanted to stay with the other side of the family."

Spencer also spoke with Father's children who were not able to provide the names of any relatives or friends that they could stay with in Texas. The children "mentioned their maternal family, but only as if those were the people that were trying to take them or that were after them. And they didn't really want to go there because of the things that their dad was telling them" Based on Spencer's interviews with Father and the children, the Department made a determination that removal of the children was necessary. Spencer subsequently passed the case on to the ongoing investigator, Tom Mogaka.

Mogaka testified he previously worked as an investigator with Collin County Child Protective Services and was assigned to Father's case. By the time Mogaka took over the case, Father had been released from jail, and the children were in foster care. Mogaka visited Father at his residence, and Father showed him a hole in the ceiling that Father had "jumped" because Father "believed someone was following him in the house." In response to questioning from the court, Mogaka confirmed that Father "jumped through the roof."[1] Mogaka saw no signs of anyone "secretly living in the home or following" Father during his visits to Father's home. Father and

---

[1] On cross-examination, Mogaka testified Father told Mogaka that Father "got up in the ceiling of the second floor and jumped through the ceiling."

Mogaka exchanged texts in which Father talked about "different conspiracies and neighbors that were involved and stealing identity and trying to steal the kids. The trial court admitted a copy of the text messages into evidence. Mogaka ultimately made the disposition in the case: "[r]eason to believe for neglectful supervision." Mogaka's disposition was "due to concerns for [Father's] mental health, as well as due to him having marijuana out and accessible to the children in the home."

Kenshaylia Jones testified she was the initial conservatorship worker on Father's case and created a service plan in this case with services for Father to work. Father did not want to "partake in" a court-ordered psychological evaluation and canceled it, and he repeatedly had conversations with Jones in which he sought to verify that the coordinator of parenting classes was "a legitimate person and that it was the correct individual that [Jones] referred for that particular service." Jones testified that, "from the time [she] had the case, [Father] never began a service." Jones spoke with Father about his reasons why he was not working services on "several different occasions." Father stated that "he did not believe that he needed the services or that he had already completed the services in California." Jones explained that Father "had to complete the services in order for the children to be returned to him," but Father was "very adamant that he was under the impression that the Department was baby-sitting the children until he was released from jail and that the children would be able to just be returned upon his release."

Jones had "some conversations" with Father where she "would have to reexplain to [Father] what the services were, because it appeared that he would not recall that he had to do court-ordered services." In some of Jones' communications with Father, there were indications that Father did not remember who she was. On several occasions, "in a phone call or in conversation," Father would refer to Jones as "Ms. White," even after Jones "would continually correct him" on her name.

There were also times when Jones supervised Father's parent/child visits when Father "would not recall who [Jones] was. Jones supervised "four or five parent/child visits, and she "did not have a lot of concerns at the first visit." However, at subsequent visits, Jones had to remind Father that there was no whispering allowed, and Father told Jones she could not "control" him or tell him what to do. Father said he was not "going to do" the "psychological" or the services. At one visit, Father became so upset with Jones that "it resulted in Jones having to get law enforcement involved." The "visits started to have a negative effect on the children."

There were times "where [Father] showed up unannounced or uninvited to places where the children were." This behavior violated a temporary order that provided Father was "only to have supervised visits at CPS's offices or a location designated by CPS." In one incident, Father "showed up to [B.M.'s] school requesting to have lunch with him." On another occasion, M.M. "was hospitalized and [Father] showed up to the inpatient center requesting a visit." M.M. was

hospitalized "for mental health issues" after he "became more aggressive to where he had to be inpatient."

The Department initiated two home studies in the case: one with the children's maternal aunt Claudia and uncle and one with Father's brother's girlfriend Ember. During visits with the children, Father stated he was going to sell his home and "just move," and Father was going to remarry, have more kids, and let B.M. and M.M. be adopted by Ember.

Paula Ringer, the caseworker in this case after Jones left the Department, testified that, after the home studies in this case were completed, the Department approved the home study with maternal aunt Claudia but did not approve the home study with Ember. The court held a permanency review hearing and a hearing on placement in August 2023 and ordered that the children be placed with maternal aunt Claudia. Ringer testified the children had been in this placement since "around the time school started" in 2023, and they were "settling in well." Both children had "pretty much the entire upstairs area" of the home, their own beds, and a place to keep their clothing and their toys. The children's caregivers were committed to making sure that all of their social and emotional needs were met, and both of the children were in therapy. Because the placement was approved in Arizona, an Arizona caseworker went to the home "at least monthly" to make contact with the children and expressed "[n]o concerns." The maternal aunt Claudia and her husband

wanted to become the permanent placement for the children, and the Department "supported them in their goal."

After the children were placed with their maternal aunt Claudia in Arizona, the visits between Father and the children "went to Zoom," but Father's behavior did not improve. Father's behavior was "somewhat bizarre" in that he wore dark colored sunglasses even though he was indoors. When Father first saw M.M. on the screen, Father started screaming "what's happened to my son?" and explained that M.M. "looked bloated." It was "a really big to-do," and the call had to be ended. When Ringer tried to redirect Father concerning the content of what he was saying in the Zoom visit, Father started to "yell, scream," and it was "awful." Father told Ringer, "you are wasting my time" and once told her "to stick a tennis ball in [her] mouth because he was unhappy with the way that [she] was supervising."

At a permanency hearing in October 2023, the Department requested that the Zoom visits cease because of Father's continued bad behavior. After viewing a video of one of the visits, the trial court determined that the visits should be terminated. After the visits ended, there was "a positive change" in the children's behavior.

As Father's caseworker, Ringer met with Father to discuss "progress in services," but Father would "go off" and Ringer's efforts to redirect Father "were not successful always." Ringer had concerns for Father's mental health and repeatedly met with Father to discuss services, but Father "didn't see any need" and "felt like he was being cheated out of his children."

Based on the circumstances of the removal and Father's arrest and "what was found in his home," Ringer testified she believed the endangerment grounds were met: that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being, and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. When asked why she believed the circumstances of the removal constituted endangerment, Ringer cited the presence of marijuana in the home, Father's belief that the marijuana was not a problem, the children's access to the marijuana within their reach, and Father's unwillingness and refusal "to seek any type of substance abuse treatment or any of the services that might have mitigated the concerns." Father went for three documented drug tests before Ringer took over the case, but he refused to submit to drug testing "at least three times" that Ringer requested that he go.

Based on Father's failure to comply with drug testing, the Department had "concerns that he continues to use a controlled substance." Ringer testified that, since the visitation with the children stopped, he had not reached out to her to ask how the children were doing, and she believed it would be in the best interest of the children to continue to stay in the home of maternal aunt Claudia. Prior to the time that maternal aunt Claudia and her husband got placement of the children, they reached out to Ringer to ask how the children were doing and traveled from Arizona

–11–

to Texas for a pre-placement visit with the children. At the visit, maternal aunt Claudia and her husband were "emotional" and "glad to see their nephews, and the children were "very eager" and "had a good time and they told Ringer they had a good time." The children showed "no fear or concern" about the visit, and after the visit the Department arranged regular video visits.

Father testified that Mother died in 2019, and he became the primary caregiver for the children. For "one week" or "three or four days max," Father's daughter J.M. was also with Father before she was removed by child welfare services in California. J.M. was not returned to Father's care because the "judge didn't want her to." When asked to tell the court about what services he had completed, Father stated that he "went through four, top-notch, highly – the highest therapist you can get out of LA County, and so I went through multiple sessions . . . ." The court interjected, requesting the "name of the classes that [Father] took." Father asked for a "second to remember" and listed several names without providing any context of the nature of Father's interaction with the people named. The court informed Father that "the names aren't really helping us very much, because we don't know who those people are" and again asked Father for the "names of the classes that [he] took." Father stated he did not know the names, but he took a "52-week therapy class" he thought "was like family counseling" that "was one-on-one the first times" and "then it was group for 52 weeks." When asked what else he attended, Father said "there was

seven different people involved," one was "a psychological evaluation," and "[a]ll the rest were therapy and group session, one of them."

Father admitted he had marijuana in the house when the children were removed and stated no one was ever caught for breaking into his home or residing in his home without his knowledge. When asked why he did not complete any services ordered by the court in this case, Father answered, "[m]y job – fulfilling my job and completing a lot of those services right before I got to Texas." Father testified his job is in finance and real estate investing, and he works between "one and two hours a day" and "six, seven, eight hours a day," depending on how he was "feeling." When asked if he did not "feel like [he had] enough time for services," Father responded that he "remember[ed] when [he] did the services, completed all of them," and he "didn't want to go back into that, pulling me out of my finance and income and stuff, to support my kids." Nevertheless, Father testified he is "[s]elf-employed" and "can kind of control [his] own hours."

Father testified he was currently residing at an apartment in Plano, Texas, and he gave the address. Father was also living at "another private place" whose address he would not reveal because "[t]hat's private information I don't want to reveal . . . for my own safety." The court ordered Father to "answer the question," and Father said he stays at his mom's house in California. In response to questioning, Father confirmed that the Plano address was for a UPS store that was his "mailing address." When asked where he was living in Texas, Father again dissembled, saying he was

"waiting to see the outcome" before he re-signed a lease or entered into a new lease, and he was "staying at a private location at the moment." When the court specifically asked Father for "the address of [his] private location," Father answered that he did not know the address.

In response to repeated questioning from the court, Father said his "private location" was near the intersection of Preston and a cross street he could not remember, then it was an apartment, then he was living with "someone else temporarily," then he was living alone, then he spent the previous night in a hotel, then his apartment was in Houston, then the address at Preston "was another place [he] was staying before." Finally, when the court asked Father if he had a permanent address, Father answered that he did "not yet" have a permanent address but there were "leases that [he had] ready" in Allen, Texas, "and also Houston." When asked what his plan would be if the children were returned to him, Father answered that he "would either rent an apartment or pay off the house."

During the cross-examination that followed, the court held Father in contempt, fining Father four times $500 for "interrupting [the court]" and "interrupting everybody." When Father was once again asked why he refused to do a court-ordered psychiatric evaluation, he answered that he "did [his] evaluation in California right before [he] came here, and [he] didn't want to distract [his] goals of [his] job in order to do that." Father testified that, "as far as stability" for the children, he was a more stable option than maternal aunt Claudia because he was their

–14–

biological father and "they lost their mother, so taking the father away from" them was "dramatic and real, real bad."

Father's counsel elicited Father's agreement that counsel, Father, and counsel's staff had "worked many, many hours trying to obtain" documents from the similar cases in California and were "unsuccessful." Father agreed that counsel explained to him that, "in the situation we were in," Father would "stand a better chance of success to go ahead and complete those services again" and that counsel would "advocate with the judge to give us more time so that [Father] could complete those services if [he] would just get plugged in." Father replied, "Yes, but I also said that it was against my religious beliefs to do those services. My therapist is Jesus Christ." When counsel explained that Father had to "come in here with evidence of the fact that [he had] a stable place to live," Father responded that he "did have a stable place in Houston." Counsel asked why Father was "playing this game," and Father responded that he "didn't want her to be harassed" and was "just trying to keep her peaceful, this lady that I am talking to." Counsel explained further that the Department had to "vet that person" and "investigate who that is," and Father had to provide the person's name, date of birth address, phone number; all of that stuff." Counsel asked Father if he "refused to do it," and Father responded, "Well, because I might want to raise them by myself instead of, you know, having a relationship with her right now."

After further discussion, the court asked Father, "If I gave your kids back, where would they live today? What's the address?" Father said he "would have to look it up on [his] phone," and after the court told Father to look it up on his phone, Father said "[I]t would be in Allen." The court asked, "Oh, I thought you said Houston?" and Father replied, "Well, I have the option." After further discussion in which the court cautioned Father to stop interrupting and rolling his eyes or "[t]he next time is jail," the court again told Father to look up the address on his phone. Father stated an address in Allen. The court asked who lived at the address and Father responded that "it is an apartment complex, a new apartment," but in response to further questioning by the court Father admitted that he did not have an apartment number, did "[n]ot yet" have a lease signed, and "[i]t determines if I get the kids."

Court Appointed Special Advocates (CASA) was appointed guardian ad litem for the children. Susan Kavulich, the CASA advocate for the children, testified she attended every in-person parent/child visit and, at the time of trial, saw them once a month by Zoom, and saw them in Arizona in November. Kavulich was able to speak with the children's caregivers and see how they were doing. The children were "settling in" and "doing great," and Kavulich believed they were "happy and healthy." Kavulich testified it was the guardian ad litem's position that Father's parental rights should be terminated, and termination was in the children's best interest because, "when [Father] is involved, there is no regard for the kids' emotional or physical well-being." Kavulich testified the guardian ad litem's

–16–

recommendation was consistent with the expressed desires of the children. M.M. "absolutely wants to stay in Arizona," and B.M.'s "desire is he is not sure."

Maternal aunt Claudia testified that the children came to her home on August 10, 2023. When the children first came to live there, they were "physically aggressive towards one another, physically fighting," and they were not sleeping well. Since then, the children were "doing well" and "thriving" and their grades at school had improved. Both children attended individual therapy twice a month. The children had also had successful visits with their sister, J.M., who lived with Claudia's sister and her family and had reconnected with Claudia's extended family. Claudia testified she and her husband believed it was in the children's best interest to remain with them until they were adults and for Father's parental rights to be terminated. The "plan" was for Claudia and her husband to adopt the children.

Claudia testified that, when the children had video visits with Father, the children appeared anxious, and B.M. would bite his fingernails. The children changed into "soccer gear" and read the Bible before the visits. After the video visits stopped, the children did not ask why they were not seeing Father on video calls anymore, and they did not ask to talk to Father.

Charity Borserine, attorney ad litem for the children, testified she visited with the children two weeks before trial and visited their schools and checked on their grades. M.M. did not want to go home to his father, and B.M. was "on the fence." Borserine testified the children were doing well at school, and their "teachers are

–17–

just amazed at how well they did when they transferred over. The children have been "excelling," and they "feel comfortable in the home" and are "doing extremely well." At the conclusion of the trial, the court orally stated that he was going to terminate Father's parental rights to the children and that termination was in the best interest of the children. On May 22, 2024, the court signed an order terminating Father's parental rights and appointing maternal aunt Claudia and her husband permanent managing conservators of the children. This appeal followed.

## Termination of Father's Parental Rights

Father argues the evidence was insufficient (1) to overcome the fit parent presumption, (2) to support termination under Texas Family Code section 161.001(b)(1)(D), (E), (O), and (P), and (3) to support that termination was in the children's best interest. In a final issue, he contends he received ineffective assistance of counsel.

## Standard of Review

The Texas Family Code provides that a court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct prohibited by section 161.001(b)(1) and that termination is in the child's best interest. *See* TEX. FAM CODE § 161.001(b)(1), (2). Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In such cases,

due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM CODE § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM CODE § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re N.T.*, 474 S.W.3d at 475. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In conducting a legal sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a

reasonable factfinder could do so. *In re N.T.*, 474 S.W.3d at 475 (internal quotation omitted). We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d at 500. When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.*; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## ANALYSIS

The court found Father engaged in conduct prohibited by paragraphs (D), (E), (O), and (P) of section 161.001(b)(1) and that termination was in the best interest of the children. *See* TEX. FAM CODE §§ 161.001(b)(1)(D), (E), (O), (P); 161.001(b)(2). When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it

affirms the termination order based on other grounds under section 161.001(b)(1). *In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam); *In re N.G.*, 577 S.W.3d at 235.

**Second and Third Issues: Endangering Environment: Section 161.001(b)(1)(D); Endangering Conduct: Section 161.001(b)(1)(E)**

We first address Father's second and third issues in which he contends the evidence was legally and factually insufficient to support the court's finding under sections 161.001(b)(1)(D) and (E).

Subsection (D) requires the factfinder to find by clear and convincing evidence that a parent: "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM CODE § 161.001(b)(1)(D). Subsection (D) focuses on whether endangerment results from the child's environment. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "Environment" refers to both the acceptability of living conditions and the parent's conduct in the home. *Id*. "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *Id*. "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.*

"'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the

conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

While paragraph (D) concerns endangerment due to the child's environment, parental conduct is relevant. *See In re J.D.B.*, 435 S.W.3d at 463. Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child. *See, e.g., Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re S.E.W.*, 168 S.W.3d 875, 882 (Tex. App.—Dallas 2005, no pet.)  A parent acts "knowingly" when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk. *See In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

Subsection (E) provides for termination of parental rights if the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of the child."  TEX. FAM. CODE § 161.001(b)(1)(E). Within the context of subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *In re I.T.,* No. 01-18-01013-CV, 2019 WL 1996515, at *8 (Tex. App.—Houston [1st Dist.] May 7, 2019, no pet.) (mem. op.) (quoting *Boyd*, 727 S.W.2d at 533). To "endanger" means to

expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*

It is unnecessary to establish a parent intended to endanger a child to support termination under subsection (E). *Id.* Nor is it necessary to establish the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *Id.* Danger to a child's well-being may be inferred from parental misconduct. *Id.*; *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re I.T.*, 2019 WL 1996515, at *8 (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Subsection (E) termination must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by a parent. *In re A.J.F.*, No. 05-23-00134-CV, 2023 WL 4247372, at *6 (Tex. App.—Dallas June 29, 2023, pet. denied) (mem. op.).

Here, Father kept marijuana in a closet where the marijuana was on a four-foot-high shelf that was not only accessible to the children but in a closet that the children used as a fort and in which they kept sleeping bags, toys, and snacks. Marijuana "shake" was on the floor of the home's laundry room in an amount that the children had to walk on it and it got on their clothes. Father admitted he had marijuana in the house when the children were removed. After the children were

removed and Father was arrested for marijuana possession, Father refused on multiple occasions to submit to required drug testing. Although the testimony at trial indicated Father may have been using methamphetamine, there is no evidence to confirm this. However, the evidence of marijuana possession and use is clear.

Father brought the children to Texas where his "relatives or support system in the area" was the coach of the FC Dallas team and also a neighbor. Father stated his reason for moving to Texas was that he "wants the boys to be on a great soccer team," so he "decided to go with" the FC Dallas team. There was no evidence presented that Father actually had any contact with personnel at the FC Dallas soccer team, and Spencer was unsuccessful in trying to contact the coach. The negative impact of Father's behavior could be seen during video calls when the children appeared anxious and would change into "soccer gear" before the calls. In bringing the children to Texas, Father also separated them from their sister, Claudia, and other maternal relatives. When Spencer spoke with the children, they viewed their maternal family as "the people that were trying to take them or that were after them." Father also lacked a permanent residence to provide a permanent home for the children.

On this record, the trial court could have formed a firm belief or conviction that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and engaged in a course of conduct that endangered the children's

physical or emotional well-being. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D, (E).

Accordingly, the evidence is legally and factually sufficient to support parental

termination under subsections (D) and (E). *See id.*; *In re N.T.*, 474 S.W.3d at 475.

We overrule Father's second and third issues.

### Fourth and Fifth Issues:  Sections 161.001(b)(1)(O), (P)

Having concluded that the evidence is sufficient to support the court's

findings under paragraphs (D) and (E), we need not address Father's fourth and fifth

issues contending the evidence was legally and factually insufficient to support the

court's findings under paragraphs (O) and (P). *See In re N.G.*, 577 S.W.3d at 232

(appellate court need uphold only one termination ground and best interest finding

to affirm termination, but due process requires appellate court to provide details of

its analysis under paragraphs (D) and (E) because of potential consequences for

parental rights to a different child under paragraph (M)).[2]

### Sixth Issue:  Best Interest of the Children

In his sixth issue, Father contends the evidence is legally and factually

insufficient to support the court's finding that termination of the parent–child

relationship was in the children's best interest. Whether termination of parental

---

[2] We note without further discussion that the evidence, which is legally and factually sufficient under (D) and (E) also supports the trial court's findings under (O) and (P). As set forth above, the record establishes that Father failed and refused to comply with court-ordered services to obtain the return of the children, including drug testing and psychiatric evaluation.  Further, the evidence of marijuana in the closet, in the laundry room and all over the children's clothes is legally sufficient to support neglect under (O). Under (P), the evidence was sufficient to establish the use and presence of marijuana, indication of methamphetamines due to the referenced crystalline substance and Father's refusal to complete a court-ordered substance abuse treatment program or a drug evaluation.

rights is in a child's best interest is "child centered," and the inquiry focuses on "the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631.

Proof concerning the statutory predicate findings under section 161.001(b)(1) does not relieve the Department of its burden of proving termination is in the child's best interest, but "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). And, although there is a strong presumption that maintaining the parent-child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. TEX. FAM. CODE §§ 153.131, 263.307(a).

The best-interest analysis may consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.); *see also In re S.V.H.*, No. 01-19-01003-CV, 2020 WL 2988567, at *7 (Tex. App.—Houston [1st Dist.] June 4, 2020, pet. denied) (mem. op.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re B.R.*, 456 S.W.3d at 616; *see In re C.H.*, 89 S.W.3d at 28 (stating past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

The supreme court has set forth a list of non-exclusive factors to be considered in determining whether termination is in a child's best interest, including (1) the

child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.N.C.*, 384 S.W.3d at 807 (quoting *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exclusive, and the State need not prove all of the factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the child's best interest. *In re A.C.*, 394 S.W.3d at 642.

Although Father, in his brief, concedes that the "trial court uses the inexhaustive list of *Holley* best interest factors in deciding whether termination is in the child's best interests," he does not address the factors. Instead, without specificity, Father challenges the "majority of best interest evidence" as "vague and conclusory statements regarding stability of the children and the alleged instability of Father, mostly based on what the unqualified Department employees have deemed as paranoia of Father." Father argues there is no evidence that he was not being adequately protective of the children or that the children suffered any harm or

–27–

neglect. Thus, Father concludes, the caseworker's conclusory testimony was not enough to prove that termination was in the children's best interest.

The record shows that M.M. expressed his desire to stay with maternal aunt Claudia and her husband, and B.M. was "on the fence." The record shows that, after evasive answers to questioning about Father's place of residence and address, Father testified that he has no permanent address or home for the children. As discussed at length previously in this opinion, Father refused to complete or even initiate any services. After the children were removed, Father refused to participate in any court-ordered services including a psychiatric evaluation or to submit to drug testing on multiple occasions. Father explained his refusal by indicating he had completed services in California, but no evidence of any such completed services was ever produced, despite the "many, many hours" his counsel and his staff spent trying to unearth such evidence. Even though Father testified he works between "one and two hours a day" and "six, seven, eight hours a day," depending on how he was "feeling," he did not have time to complete any services because he "did not want to go back into that," he "did [his] evaluation in California right before [he] came here, and [he] didn't want to distract [his] goals of [his] job in order to do that," and it was "against his religion." Despite his admitted marijuana use, possible use of other substances, and concerns over his mental health, Father refused again and again to submit to drug testing or participate in a psychiatric evaluation.

The evidence showed that Father was informed repeatedly, including in an admonishment by the court, that he could not get his children back unless he did court-ordered services, and Father testified at trial that he understood this fact. Nevertheless, Father refused to do any services. Thus, the record is clear that Father refused services that might have helped him improve his parenting abilities, refused to undergo a psychiatric evaluation that might have improved his mental health and allowed him to better provide a stable home for the children, and took a wait-and-see attitude to securing a permanent address and making a plan for the children's return and future well-being.

In contrast, the children were thriving in their new home in Arizona with caretakers who plan to adopt them and provide them with a family until they are adults. After initial aggressive behaviors, the children were "doing well" and "thriving" and their grades at school had improved. Both children attended individual therapy twice a month. The children had also had successful visits with their sister, J.M., who lived with Claudia's sister and her family and had reconnected with Claudia's extended family.

On the record before us, we conclude the evidence is both legally and factually sufficient to establish that termination of the parent–child relationship between Father and the children was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). We overrule Father's sixth issue.

**First Issue: Fit Parent Presumption**

In his first issue, Father argues the "evidence was insufficient to overcome the fit parent presumption and the Texas and U.S. Constitutional rights afforded to Father." Father appears to argue the fit parent presumption is a separate hurdle the Department must overcome independently and in addition to establishing by clear and convincing evidence grounds supporting the termination of his parental rights under section 161.001(b)(1) and that termination of his parental rights was in the children's best interest. Father cites *In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) for support.

We have addressed Father's same argument recently, explaining that (1) the vast majority of cases citing *C.J.C.* do so as authority for application of the fit-parent presumption in modification suits rather than termination suits, and (2) termination cases that do rely on *C.J.C.*'s statement of the presumption discuss the holding within the overall review of the evidence supporting termination. *In re A.B.*, No. 05-23-00667-CV, 2023 WL 8863490, at *11 (Tex. App.—Dallas Dec. 22, 2023, pet. filed; *Anders* motion to withdraw filed).

A parent has a constitutional right to the care, custody, and control of her child. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). And when the government seeks not only to infringe on this fundamental right, but to terminate the right altogether, such termination is considered "traumatic, permanent, and irrevocable" and "constitutes the 'death penalty' of civil cases." *In re J.C.H.-P.*, 673 S.W.3d 262, 264 (Tex. App.—San Antonio 2023, no pet.). As extensively discussed above, the trial

–30–

court could have formed a firm belief or conviction Father engaged in a course of conduct that endangered B.M. and M.M.'s physical or emotional well-being and termination of his parental rights was in B.M. and M.M.'s best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1)(E), (b)(2). Under the facts of this case, the Department overcame the fit parent presumption and Father has not shown he was denied any other constitutional due process. We overrule Father's first issue.

### Seventh Issue: Ineffective Assistance of Counsel

In Father's seventh issue, he argues he received ineffective assistance of counsel. Specifically, Father complains of trial counsel's failure to request a continuance to obtain documents from similar cases in California, failure to request a jury trial, failure to object to Spencer's "conclusory and leading testimony" that removal of the children was necessary "due to neglect," and failure to present evidence of the children's well-being with Father as compared with the foster parents.

In parental termination cases, a review for ineffective assistance of counsel encompasses the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). First, Father must show counsel's performance was deficient. *Strickland*, 668 U.S. at 687. This requires showing counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the parent by the Sixth Amendment. *Id.* Second, the parent

must show the deficient performance prejudiced the defense. *Id.* This requires showing counsel's errors were so serious as to deprive Father of a fair trial. *Id.*

To establish an ineffective assistance claim, Father must successfully establish both *Strickland* prongs. *In re M.S.*, 115 S.W.3d at 545. Further, an allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for the actions. *In re Z.M.R.*, 562 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *In re M.S.*, 115 S.W.3d at 545. In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance deficient. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Father complains about counsel's failure to request a continuance to obtain documents from similar cases in California, but the record shows that, during Father's testimony, counsel elicited Father's agreement that counsel, Father, and

counsel's staff had "worked many, many hours trying to obtain those documents" and were "unsuccessful." Father agreed that counsel explained to him that, "in the situation we were in," Father would "stand a better chance of success to go ahead and complete those services again" and that counsel would "advocate with the judge to give us more time so that [Father] could complete those services if [he] would just get plugged in." Father replied, "Yes, but I also said that it was against my religious beliefs to do those services. My therapist is Jesus Christ."

There is no evidence in the record to indicate that Father wanted a jury trial or that the issue was raised at trial. Spencer's testimony that removal of the children was necessary was based on interviews with Father and with the children and followed Spencer's testimony detailing those interviews. Finally, while Father complains of counsel's failure to present evidence of the children's well-being with Father as compared with the foster parents, there is nothing in the record to show what that evidence might have been.

The record is silent as to counsel's strategy for proceeding without a continuance in a trial before the court, choosing not to object to Spencer's testimony, and choosing not to present unspecified evidence of the children's well-being with Father before the removal. Consequently, it is impossible to determine whether the alleged failures were matters of strategy or competency. *In re M.G.*, No. 14-09-00136-CV, 2009 WL 3818856, at *11 (Tex. App.—Houston [14th Dist.] Nov. 17, 2009, no pet.) (mem. op.). Indeed, matters of omission, such as the alleged conduct

here, are particularly ill-suited for review on direct appeal where counsel's reasoning has not been developed in the record. *Id.* Because the record is silent on these matters, Father cannot overcome the presumption that counsel's performance was competent. *Id.* Under these circumstances, we conclude Father has not satisfied *Strickland* and overrule his seventh issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/

BONNIE LEE GOLDSTEIN

240639F.P05

JUSTICE

–34–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF B.M. AND M.M., CHILDREN

No. 05-24-00639-CV

On Appeal from the 296th Judicial District Court, Collin County, Texas Trial Court Cause No. 296-30022-2023.
Opinion delivered by Justice Goldstein. Justices Garcia and Miskel participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 22nd day of November 2024.